**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| WEIDING WU, derivatively on behalf of ADAPTHEALTH CORP., | |
| Plaintiff, | **Case No.: 2:24-CV-1202** |
| vs. | |
| RICHARD BARASCH, LUKE MCGEE, STEPHEN P. GRIGGS, JASON A. CLEMENS, FRANK J. MULLEN, GREG BELINFANTI, TERENCE CONNORS, BRADLEY COPPENS, TED LUNDBERG, JOSHUA PARNES, SUSAN WEAVER, DAVID S. WILLIAMS III, DALE WOLF, and ALAN QUASHA, | **DEMAND FOR JURY TRIAL** |
| Defendants, | |
| and | |
| ADAPTHEALTH CORP., | |
| Nominal Defendant. | |

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

**INTRODUCTION**

Plaintiff Weiding Wu ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant AdaptHealth Corp. ("AdaptHealth" or the "Company"), files this Verified Shareholder Derivative Complaint against Richard Barasch ("Barasch"), Luke McGee ("McGee"), Stephen P. Griggs ("Griggs"), Jason A. Clemens ("Clemens"), Frank J. Mullen ("Mullen"), Greg Belinfanti ("Belinfanti"), Terence Connors ("Connors"), Bradley Coppens ("Coppens"), Ted Lundberg ("Lundberg"), Joshua Parnes ("Parnes"), Susan Weaver ("Weaver"), David S. Williams III ("Williams"), Dale Wolf ("Wolf"), and Alan Quasha ("Quasha") (collectively, the "Individual Defendants," and together with AdaptHealth, the "Defendants") for

1

breaches of their fiduciary duties as directors and/or officers of AdaptHealth, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and for contribution under Sections 21D of the Exchange Act and Section 11(f) of the Securities Act of 1933 (the "Securities Act"). As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by the Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding AdaptHealth, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by AdaptHealth's directors and officers from August 4, 2020 to February 27, 2023, inclusive (the "Relevant Period").

2.      AdaptHealth is a Delaware-incorporated holding company of full-service medical equipment subsidiaries focused on developing and providing at home medical equipment ("HME") for chronic health conditions, such as diabetes and sleep apnea.

3.      During the Relevant Period, the Company reported strong growth in both organic growth and mergers and acquisitions ("M&As"). One purportedly substantial component of the Company's M&A growth was through the acquisition of diabetes HME companies. Most notably,

on July 2, 2020, the Company acquired Solara Medical Supplies LLC ("Solara") and ActivStyle Inc. for $487 million. At the time of the acquisition, Solara was the largest independent distributor of continuous glucose monitors ("CGM"). CGMs are devices used to automatically estimate an individual's blood glucose level, otherwise known as blood sugar.

4.     Through AdaptHealth's business model, the Company sells directly to patients and bills the patients' insurance providers to receive reimbursements. As such, the Company conducts its business with both private insurance providers and public insurance providers, such as Centers for Medicare and Medicaid Services ("CMS"). Moreover, a substantial amount of AdaptHealth's revenues purportedly comes from CMS.

5.     Recently, technological advancements have been made pertaining to the production of CGMs. Indeed, while older versions of CGMs required patients to utilize a monthly supply of finger pricks with a stand-alone transmitter and monitor, newer versions of CGMs come in the form of a single small device, which bundles the transmitter, monitor, and sensor into the same device to be continuously worn by the patient, without the need for finger pricks.

6.     CMS, and many private insurance companies, calculate reimbursement rates based on the type of codes selling companies use when submitting their claims, with companies using either "A-codes" or "K-codes." The older diabetes technology involving traditional finger pricks is billed under A-codes and qualifies for monthly reimbursements of $400, in addition to a one-time sensor reimbursement ranging from $900 to $1,200. In contrast, the newer CGMs are billed under K-codes, and qualify for a much lower monthly reimbursements, ranging from just $250 to $270.

7.     On January 4, 2021, the Company announced a Secondary Public Offering ("SPO") by issuing a press release to the investing public. In the subsequent days and through a series of

press releases, the Company announced the pricing of the SPO, and represented to investors that it would sell 7,250,000 shares of AdaptHealth common stock and that a selling stockholder would sell an additional 750,000 shares of AdaptHealth common stock at a price of $33 per share. Additionally, AdaptHealth disclosed a 30-day option that the Company would grant for underwriters to purchase up to 1,200,000 additional shares of Company common stock.

8.      On or around January 5, 2021, the Company conducted the SPO. In the SPO, the Company sold 8,450,000 shares of AdaptHealth common stock, which included the full exercise of the underwriters' option to purchase an additional 1,200,000 shares, and a selling stockholder sold an additional 750,000 shares of Company common stock.

9.      The SPO sales were issued pursuant to the Offering Materials (defined below). Through the Offering Materials and a number of documents incorporated therein by reference, the Individual Defendants made and/or caused the Company to make a series of materially false and misleading statements and/or omissions which represented, *inter alia*, that AdaptHealth's organic growth was bolstered by "maintaining and broadening" the Company's "strong network of highly diversified referral relationships." Additionally, the Offering Materials misleadingly represented that the Company's "Business Strategy" was to "grow its revenues while expanding margins through targeted strategies for organic growth."

10.     The Individual Defendants continued to misrepresent the organic growth of the Company's diabetes segment throughout the Relevant Period, stating, among other things, that "the growth rates are going to be pretty strong for certainly the foreseeable future" and that "we're very, very comfortable with high teens growth rate right now," in reference to the Company's diabetes segment continued growth. However, the reality was that AdaptHealth's record sales and substantial growth were actually driven by improper upcoding and other illicit billing practices.

11.     The truth emerged on February 28, 2023 when the Company announced its financial results for the full year 2023. That day, the Company surprised investors by disclosing a loss of $0.02 per share for the fourth quarter of 2022—well short of the $0.27 per share gain that analysts had been expecting based on the Individual Defendants' representations throughout the Relevant Period. Moreover, the Company announced it was reducing its 2023 guidance and lowering revenue expectations that had been provided just seven weeks earlier by over 1.5%, with AdaptHealth attributing the surprising shortcoming and lower guidance to "tempered expectations on diabetes."

12.     On this news, the Company's stock price declined from $21.98 per share at the closing of trade on February 27, 2023 to $15.99 per share at the closing of trade on February 28, 2023. This represented a decline of $5.99 per share, or 27%.

13.     During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public that failed to disclose, *inter alia*, that: (1) the Company had misstated the ability to generate and sustain organic growth in its diabetes segment; (2) the Company had engaged in improper and illicit billing practices in seeking reimbursements from insurance companies; (3) the Company's purported warnings that it "could be adversely affected" if it was found to engage in overbilling as a result of "coding errors" omitted that the risk presented by overbilling had already materialized due to the Defendants' misconduct as alleged herein; and (4) as a result of the foregoing, Defendants' statements about

the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis at all relevant times.

14.     Furthermore, during the Relevant Period, the Individual Defendants breached their fiduciary duties by causing the Company to repurchase its own stock at prices that were artificially inflated due to the foregoing misrepresentations. Approximately 750,835 shares were repurchased between June 1, 2022 and September 30, 2022 for nearly $14.1 million. As the Company stock was actually only worth $15.99 per share, the price at close on February 28, 2023, the Company overpaid by nearly $2.11 million in total.

15.     Additionally, Defendants Mullen and Weaver breached their fiduciary duty by engaging in lucrative insider sales of Company common stock while the price was artificially inflated, resulting in combined proceeds of approximately $62,172.

16.     In light of the Individual Defendants' misconduct—which has subjected the Company and various of its former and current officers and directors to a consolidated federal securities fraud class action lawsuit pending in the United States District Court for the Eastern District of Pennsylvania (the "Securities Class Action"), the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein— the Company will have to expend many millions of dollars. The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

17.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and

misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action, of the officers' and directors' liability in the Securities Class Action, and of their not being disinterested and/or independent directors, a majority of the Company's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

18.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 11(f) of the Securities Act, 15 U.S.C. § 77k(f)(1), Section 21D of the Exchange Act, 15 U.S.C. §  78u-4(f), Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a) and 78t-1), and SEC Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder.

19.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

20.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

21.     Venue is proper in this District because the alleged misstatements and wrongs complained of herein entered this District, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

22.     Plaintiff is a current shareholder of AdaptHealth. Plaintiff has continuously held AdaptHealth common stock since purchasing the stock on April 14, 2021.

### Nominal Defendant AdaptHealth

23.     AdaptHealth is a Delaware corporation with principal executive offices at 220 West Germantown Pike, Suite 250, Plymouth Meeting, PA 19462. AdaptHealth's common stock trades on the NASDAQ Stock Market ("NASDAQ") under the ticker symbol "AHCO."

**Defendant Barasch**

24.     Defendant Barasch has served as the Chairman of the Board since 2019 and as interim CEO of AdaptHealth since July 1, 2023. As a member of the Board, Defendant Barasch serves as Chairperson of the Nominating & Governance Committee and as a member of the Compensation and Compliance Committees. According to the proxy statement the Company filed on Schedule 14A with the SEC on May 1, 2023 (the "2023 Proxy Statement"), as of April 25, 2023, Defendant Barasch beneficially owned 881,221 shares of Company common stock. Given that the price per share of the Company's common stock at the close of trading on April 25, 2023 was $11.49, Defendant Barasch beneficially owned approximately $10.125 million worth of AdaptHealth stock as of that date.

25.     For the fiscal year ended December 31, 2022 (the "2022 Fiscal Year"), Defendant Barasch received $370,762 in total compensation from the Company. This included $102,500 in fees earned or paid in cash and $268,262 in stock awards. For the fiscal year ended December 31, 2021 (the "2021 Fiscal Year"), Defendant Barasch received $250,268 in total compensation from the Company. This included $50,000 in fees earned or paid in cash and $200,268 in stock awards. For the fiscal year ended December 31, 2020 (the "2020 Fiscal Year"), Defendant Barasch received $251,733 in total compensation from the Company. This included $50,000 in fees earned or paid in cash and $201,733 in stock awards.

26.     The 2023 Proxy Statement stated the following about Defendant Barasch:

**Richard Barasch** has served as our Chairman since our formation and served as the President and Chief Executive Officer of DFB from our formation to the closing of the Business Combination. Mr. Barasch was Chief Executive Officer of

Universal American Corp., a publicly-traded health insurance and services company focused on the senior market and government programs, from 1995 until Universal American's acquisition by WellCare Health Plans in May 2017. Mr. Barasch has developed an extensive network of contacts throughout the healthcare industry and speaks regularly at industry conferences as a healthcare services expert. He is currently Executive Chairman of DFP Healthcare Acquisitions Corp and Deerfield Healthcare Technology Acquisitions Corp. He serves on the Board of Advisors of the Health Policy and Management program at the Columbia University School of Public Health and the Brown School of Public Health. He also serves on the Board of Trustees of the Maimonides Medical Center in Brooklyn, New York. Mr. Barasch graduated from Swarthmore College and Columbia University Law School.

**Defendant McGee**

27.     Defendant McGee served as AdaptHealth's CEO and as a Company director from March 20, 2019 until his resignation on June 11, 2021. According to the proxy statement the Company filed on Schedule 14A with the SEC on May 2, 2022 (the "2022 Proxy Statement"), as of April 26, 2022, Defendant McGee beneficially owned 4,746,601 shares of Company common stock. Given that the price per share of the Company's common stock at the close of trading on April 26, 2022 was $13.52, Defendant McGee owned approximately $64.17 million worth of AdaptHealth stock as of that date.

28.     For the 2021 Fiscal Year, Defendant McGee received $8,061,871 in total compensation from the Company. This included $243,875 in salary, $2 million in bonus, $603,844 in stock awards, $5,204,914 in option awards, and $9,238 in all other compensation. For the 2020 Fiscal Year, Defendant McGee received $1,009,533 in total compensation from the Company. This included $500,000 in salary, $500,000 in non-equity incentive plan compensation, and $9,533 in all other compensation.

**Defendant Griggs**

29.     Defendant Griggs served as the Company's CEO from June 2021 until he resigned from his position, effective June 30, 2023. Prior to this, Defendant Griggs served as the Company's

Co-CEO from February 2021 to June 2021. According to the 2023 Proxy Statement, as of April 25, 2023, Defendant Griggs beneficially owned 5,208,687 shares of Company common stock. Given that the price per share of the Company's common stock at the close of trading on April 25, 2023 was $11.49, Defendant Griggs beneficially owned approximately $59.85 million worth of AdaptHealth stock as of that date.

30.     For the 2022 Fiscal Year, Defendant Griggs received $4,724,344 in total compensation from the Company. This included $625,000 in salary, $3,698,882 in stock awards, $398,938 in non-equity incentive plan compensation, and $1,524 in all other compensation. For the 2021 Fiscal Year, Defendant Griggs received $3,935,883 in total compensation from the Company. This included $490,385 in salary, $496,036 in stock awards, $2,299,462 in option awards, and $650,000 in non-equity incentive plan compensation.

31.     The 2023 Proxy Statement stated the following about Defendant Griggs:

**Stephen Griggs** joined the Company as Co-Chief Executive Officer in February 2021 and became Chief Executive Officer in June 2021. In November of 2000, Mr. Griggs formed AeroCare and served as its Chairman and Chief Executive Officer. Prior to joining AeroCare, Mr. Griggs served as President of Rotech Medical Corp., a publicly-traded provider of home medical equipment, respiratory equipment and services, and respiratory (nebulizer) medications for home use. Mr. Griggs practiced as a CPA with a prominent accounting firm located in Orlando, Florida. Mr. Griggs was one of the founders of Nexus Group, Inc. and is one of its principals and Managing Directors. Nexus Group provides advisory services in the area of mergers and acquisitions. Mr. Griggs holds a B.S.B.A. in Business Management from East Tennessee State University and a B.S.B.A. in Accounting from University of Central Florida.

**Defendant Clemens**

32.     Defendant Clemens has served as the Company's CFO since August 3, 2020. According to the 2023 Proxy Statement, as of April 25, 2023, Defendant Clemens beneficially owned 175,958 shares of Company common stock. Given that the price per share of the

Company's common stock at the close of trading on April 25, 2023 was $11.49, Defendant Clemens owned approximately $2.02 million worth of AdaptHealth stock as of that date.

33.     For the 2022 Fiscal Year, Defendant Clemens received $2,577,400 in total compensation from the Company. This included $520,000 in salary, $1,707,204 in stock awards, $331,916 in non-equity incentive plan compensation, and $18,280 in all other compensation. For the 2021 Fiscal Year, Defendant Clemens received $2,820,707 in total compensation from the Company. This included $446,111 in salary, $1,872,734 in stock awards, $483,250 in non-equity incentive plan compensation, and $18,612 in all other compensation. For the 2020 Fiscal Year, Defendant Clemens received $1,603,618 in total compensation from the Company. This included $179,808 in salary, $150,000 in bonus, $1,107,552 in stock awards, $159,375 in non-equity incentive plan compensation, and $6,883 in all other compensation.

34.     The 2023 Proxy Statement stated the following about Defendant Clemens:

**Jason Clemens** joined AdaptHealth in 2020 from MEDNAX, Inc, a national provider of health solutions to hospitals, health systems, and healthcare facilities, where he served as Senior Vice President and Operations Chief Financial Officer. Over a nine-year career at MEDNAX, Mr. Clemens held positions of increasing responsibility in operations management and finance. Prior to joining MEDNAX, Mr. Clemens served in progressive roles within operations management and finance at Accenture, Lennar, and Ryder. Mr. Clemens holds a B.S. in Industrial Engineering from Lehigh University, and an M.S. in Finance and M.B.A. from the Indiana University Kelley School of Business. He is also a Chartered Financial Analyst (CFA) and a Certified Six Sigma Blackbelt.

**Defendant Mullen**

35.     Defendant Mullen served as the Company's Chief Accounting Officer ("CAO") from September 21, 2020 until he resigned effective May 16, 2022.

36.     On September 23, 2021, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Mullen sold 945 shares of Company common stock on inside information at a price of $23.52 per share for total proceeds of approximately

$22,229. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

37.     The 2022 Proxy Statement stated the following about Defendant Mullen:

**Frank Mullen** joined AdaptHealth in 2020. Prior to joining AdaptHealth, Mr. Mullen served as the Vice President and Controller of Ryder System, Inc., a leading global logistics and transportation company, since September 2017. Prior to joining Ryder System, Inc., Mr. Mullen was Chief Accounting Officer of Global Eagle Entertainment Inc. and served as Vice President and Controller at Pinnacle Foods Inc. Prior to his role at Pinnacle Foods, Mr. Mullen spent over 15 years with Aramark, where he held positions of increasing responsibility culminating in his role as Vice President and Assistant Controller. Mr. Mullen began his career in the audit and assurance practice of Arthur Andersen LLP. Mr. Mullen holds a bachelor's degree in accounting from Villanova University and is a Certified Public Accountant. On November 19, 2021, Mr. Mullen notified the Company that he will be leaving AdaptHealth effective May 16, 2022.

**<u>Defendant Belinfanti</u>**

38.     Defendant Belinfanti has served as a Company director since September 2021. As a member of the Board, Defendant Belinfanti also serves as a member of the Compensation Committee and the Nominating & Governance Committee. According to the 2023 Proxy Statement, as of April 25, 2023, Defendant Belinfanti beneficially owned 13,830 shares of Company common stock. Given that the price per share of the Company's common stock at the close of trading on April 25, 2023 was $11.49, Defendant Belinfanti owned approximately $158,907 worth of AdaptHealth stock as of that date.

39.     For the 2022 Fiscal Year, Defendant Belinfanti received $269,532 in total compensation from the Company. This included $102,500 in fees earned or paid in cash and $167,032 in stock awards. For the 2021 Fiscal Year, Defendant Belinfanti received $125,145 in total compensation from the Company. This included $25,000 in fees earned or paid in cash and $100,145 in stock awards.

40.     The 2023 Proxy Statement stated the following about Defendant Belinfanti:

**Gregory Belinfanti** has served on our board of directors since September 2021. Greg is a Senior Managing Director and a member of the Investment Committee at One Equity Partners. During his tenure at OEP, Mr. Belinfanti has worked on a number of investments in the healthcare and business services industries and has led many of OEP's healthcare transactions. Mr. Belinfanti is a member of the Board of Directors of InfuCareRx, Montgomery Transportation, Ernest Health and AMT, and has previously been a member of the Board of Directors of The Results Companies, PS Logistics, Apollo Health Street, ArthroCare, Celltrion Healthcare, EGS, OneLink, Prodigy, Simplura Health Group, and Systagenix. Prior to joining OEP, Mr. Belinfanti served as a Vice President in the Investment Banking division of Lehman Brothers, specializing in Global Healthcare. Mr. Belinfanti received his B.A. in Politics from New York University and his J.D. from Harvard University.

**Defendant Connors**

41.     Defendant Connors has served as a Company director since July 8, 2019. As a member of the Board, Defendant Connors also serves as Chairperson of the Audit Committee and as a member of the Nominating & Governance Committee. According to the 2023 Proxy Statement, as of April 25, 2023, Defendant Connors beneficially owned 23,339 shares of Company common stock. Given that the price per share of the Company's common stock at the close of trading on April 25, 2023 was $11.49, Defendant Connors owned approximately $268,165 worth of AdaptHealth stock as of that date.

42.     For the 2022 Fiscal Year, Defendant Connors received $304,532 in total compensation from the Company. This included $137,500 in fees earned or paid in cash and $167,032 in stock awards. For the 2021 Fiscal Year, Defendant Connors received $200,145 in total compensation from the Company. This included $100,000 in fees earned or paid in cash and $100,145 in stock awards. For the 2020 Fiscal Year, Defendant Connors received $200,866 in total compensation from the Company. This included $100,000 in fees earned or paid in cash and $100,866 in stock awards.

43.     The 2023 Proxy Statement stated the following about Defendant Connors:

**Terence Connors** has been a member of our board of directors since the closing of the Business Combination. Mr. Connors brings to the board 40 years of public accounting experience. Mr. Connors retired in September 2015 from KPMG LLP, where he served as Professional Practice Partner, SEC Reviewing Partner and as a member of KPMG's board of directors (2011-2015), where he chaired the Audit, Finance & Operations Committee. Prior to joining KPMG in 2002, he was a partner with another international accounting firm. During his career, he served as a senior audit and global lead partner for numerous public companies, including Fortune 500 companies. Mr. Connors currently serves as a board member and audit committee chairman of two other public companies: Suburban Propane Partners L.P. and FS Credit Real Estate Investment Trust, Inc.  Mr. Connors previously served as a trustee of St. Joseph's Preparatory School in Philadelphia and also served as Chairman and President of the Philadelphia Chapter of the National Association of Corporate Directors (NACD). Mr. Connors received his undergraduate degree in Accounting from LaSalle University.

**Defendant Coppens**

44.     Defendant Coppens has served as a Company director since July 2020. As a member of the Board, Defendant Coppens also serves as Chairperson of the Compensation Committee and as a member of the Audit Committee. According to the 2023 Proxy Statement, as of April 25, 2023, Defendant Coppens beneficially owned 20,595 shares of Company common stock. Given that the price per share of the Company's common stock at the close of trading on April 25, 2023 was $11.49, Defendant Coppens owned approximately $236,637 worth of AdaptHealth stock as of that date.

45.     For the 2022 Fiscal Year, Defendant Coppens received $297,282 in total compensation from the Company. This included $110,000 in fees earned or paid in cash and $187,282 in stock awards. For the 2021 Fiscal Year, Defendant Coppens received $175,153 in total compensation from the Company. This included $50,000 in fees earned or paid in cash and $125,153 in stock awards. For the 2020 Fiscal Year, Defendant Coppens received $125,866 in total compensation from the Company. This included $25,000 in fees earned or paid in cash and $100,866 in stock awards.

46.     The 2023 Proxy Statement stated the following about Defendant Coppens:

**Brad Coppens** has served on our board of directors since July 2020. Mr. Coppens is a Senior Managing Director of InTandem Capital Partners. Brad has been identifying, evaluating and executing private equity transactions in the healthcare services sector for more than 17 years. In addition to AdaptHealth, Brad serves on the board of directors at BeBright, HouseWorks, Vivo Infusion and Providence Care. Before joining InTandem, he was a Senior Managing Director at One Equity Partners. At One Equity Partners, Mr. Coppens has focused principally in the healthcare industry and has worked on numerous investments in both the healthcare and technology-enabled services industries. From 2012 to 2014, Brad lived in São Paulo, Brazil and led One Equity Partners' prior investing efforts in the region. Mr. Coppens has served as a member of the boards of directors of AdaptHealth, AMT/RestorixHealth, Ernest Health, OneLink, ResultsCX, Allied, Cless Cosméticos, Portal de Documentos, Prodigy Health Group, Simplura Health Group, Systagenix Wound Management, Unicoba, Wow! Nutrition and X-Rite. Mr. Coppens was also deeply involved in One Equity Partners' investments in ArthroCare and Wright Medical. Prior to One Equity Partners, Mr. Coppens worked in the investment banking division of JPMorgan in the mergers and acquisitions group where he focused on healthcare and various other industries. Mr. Coppens is actively involved in a number of non-profit organizations and serves as a board member of The TEAK Fellowship. Mr. Coppens received his B.B.A. from the Stephen M. Ross School of Business at the University of Michigan, where he graduated with high distinction.

**Defendant Lundberg**

47.     Defendant Lundberg has served as a Company director since February 2021. As a member of the Board, he also serves as a member of the Audit Committee and the Nominating & Governance Committee. According to the 2023 Proxy Statement, as of April 25, 2023, Defendant Lundberg beneficially owned 9,471,173 shares of Company common stock. Given that the price per share of the Company's common stock at the close of trading on April 25, 2023 was $11.49, Defendant Lundberg owned[1] approximately $108,823,778 worth of AdaptHealth stock as of that date.

48.     For the 2022 Fiscal Year, Defendant Lundberg received $277,032 in total compensation from the Company. This included $110,000 in fees earned or paid in cash and

---

[1] Includes shares beneficially owned by Peloton Equity GP, LLC, a private equity firm where Defendant Lundberg is a founding partner.

$167,032 in stock awards. For the 2021 Fiscal Year, Defendant Lundberg received $137,645 in total compensation from the Company. This included $37,500 in fees earned or paid in cash and $100,145 in stock awards.

49.     The 2023 Proxy Statement stated the following about Defendant Lundberg:

**Ted Lundberg** has served on our board of directors since February 2021. Mr. Lundberg is a Founding Partner at Peloton Equity, LLC. Peloton Equity is a private equity firm that focuses on investing in growing healthcare companies. He previously worked at Ferrer Freeman & Company and prior to that, Donaldson, Lufkin and Jenrette. Mr. Lundberg currently serves on the boards of Arcadia Solutions, Inc. HPOne, Inc., Friday Health Plans, Inc., ClearSky Health, Inc., Aerosafe Global, Inc. and IDX, Inc. Mr. Lundberg holds a B.A. degree from Princeton University.

**Defendant Parnes**

50.     Defendant Parnes has served as President of the Company and as a member of the Board since July 8, 2019. According to the 2023 Proxy Statement, as of April 25, 2023, Defendant Parnes beneficially owned 1,677,144 shares of Company common stock. Given that the price per share of the Company's common stock at the close of trading on April 25, 2023 was $11.49, Defendant Parnes owned approximately $19,270,385 worth of AdaptHealth stock as of that date.

51.     For the 2022 Fiscal Year, Defendant Parnes received $4,740,940 in total compensation from the Company. This included $625,000 in salary, $3,698,882 in stock awards, $398,938 in non-equity incentive plan compensation, and $18,120 in all other compensation. For the 2021 Fiscal Year, Defendant Parnes received $3,977,930 in total compensation from the Company. This included $527,778 in salary, $496,036 in stock awards, $2,299,462 in option awards, $650,000 in non-equity incentive plan compensation, and $4,654 in all other compensation. For the 2020 Fiscal Year, Defendant Parnes received $1,000,489 in total compensation from the Company. This included $500,000 in salary, $500,000 in non-equity incentive plan compensation, and $489 in all other compensation.

52.     The 2023 Proxy Statement stated the following about Defendant Parnes:

**Joshua Parnes** joined AdaptHealth Holdings in 2013 with the acquisition of Ocean Home Health and was appointed President of AdaptHealth Holdings in August 2017. Mr. Parnes has served on our board of directors since the closing of the Business Combination. Mr. Parnes is a home medical equipment ("HME") entrepreneur building Ocean Home Health from a startup into a technology-focused HME and Diabetes provider and has over 19 years of Strategy and operating experience in the home medical equipment industry. Mr. Parnes focuses on Technology, Strategy and Operations.

### Defendant Weaver

53.     Defendant Weaver has served as a Company director since February 2018. As a member of the Board, Defendant Weaver also serves as the Chairperson of the Compliance Committee and as a member of the Nominating & Governance Committee. According to the 2023 Proxy Statement, as of April 25, 2023, Defendant Weaver beneficially owned 41,894 shares of Company common stock. Given that the price per share of the Company's common stock at the close of trading on April 25, 2023 was $11.49, Defendant Weaver owned approximately $481,362 worth of AdaptHealth stock as of that date.

54.     For the 2022 Fiscal Year, Defendant Weaver received $283,282 in total compensation from the Company. This included $116,250 in fees earned or paid in cash and $167,032 in stock awards. For the 2021 Fiscal Year, Defendant Weaver received $175,145 in total compensation from the Company. This included $75,000 in fees earned or paid in cash and $100,145 in stock awards. For the 2020 Fiscal Year, Defendant Weaver received $175,866 in total compensation from the Company. This included $75,000 in fees earned or paid in cash and $100,866 in stock awards.

55.     On March 17, 2021, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Weaver sold 1,050 shares of Company common stock on inside information at a price of $38.04 per share for total proceeds of approximately $39,943.

Her insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate her motive in facilitating and participating in the scheme.

56.     The 2023 Proxy Statement stated the following about Defendant Weaver:

**Susan Weaver, M.D.** has served on our board of directors since February 2018. Dr. Weaver served as President and then Chief Executive Officer of KEPRO, a technology enabled healthcare services company, from July 2018 until the successful sale of the company in December 2022. She previously served as the Chief Executive Officer of C 3 HealthcareRX and as the Founder and President of Transformation Health Partners, LLC. Dr. Weaver also served as the Chief Medical Officer for Blue Cross Blue Shield of North Carolina from 2014 to 2015 after serving as the Vice President, Health Delivery Redesign from 2012 to early 2014. Prior to joining Blue Cross Blue Shield of North Carolina, Dr. Weaver served in various leadership roles at WakeMed Health & Hospitals including Executive Vice President, Medical Affairs. Dr. Weaver also previously served as an Executive Director and Physician and founding member for Alliance Medical Ministry, a 501(c)(3) providing medical care to the working uninsured of Wake County, North Carolina. She holds an M.D. from Duke University School of Medicine and a B.S. in Psychology from Duke University.

**Defendant Williams**

57.     Defendant Williams has served as a Company director since July 2020. As a member of the Board, Defendant Williams also serves as a member of the Compensation and Compliance Committees. According to the 2023 Proxy Statement, as of April 25, 2023, Defendant Williams beneficially owned 16,085 shares of Company common stock. Given that the price per share of the Company's common stock at the close of trading on April 25, 2023 was $11.49, Defendant Williams owned approximately $184,817 worth of AdaptHealth stock as of that date.

58.     For the 2022 Fiscal Year, Defendant Williams received $269,532 in total compensation from the Company. This included $102,500 in fees earned or paid in cash and $167,032 in stock awards. For the 2021 Fiscal Year, Defendant Williams received $150,145 in total compensation from the Company. This included $50,000 in fees earned or paid in cash and $100,145 in stock awards. For the 2020 Fiscal Year, Defendant Williams received $125,866 in

total compensation from the Company. This included $25,000 in fees earned or paid in cash and $100,866 in stock awards.

59.     The 2023 Proxy Statement stated the following about Defendant Williams:

**David S. Williams III** has served on our board of directors since July 2020. Mr. Williams is a serial entrepreneur and currently co-founder and CEO of Care3, a digital health equity solution for health plans and providers. Prior to Care3, Mr. Williams was Co-Founder and CEO of InvolveCare (funded by Aetna) and a Founding Executive of PatientsLikeMe (acquired by United Health Group). He has also held corporate positions at Eli Lilly and Company and Deloitte. Mr. Williams also currently serves on the board of directors of Lifespace Communities, Inc., a private senior living company with 14 locations in seven states. Mr. Williams is a Henry Crown Fellow of The Aspen Institute and a member of the Aspen Global Leadership Network. Mr. Williams earned a BS in Economics and Entrepreneurial Management from The Wharton School of the University of Pennsylvania and an MBA in Digital Strategy with a certificate in Corporate Governance from the UCLA Anderson School of Management.

**Defendant Wolf**

60.     Defendant Wolf has served as a Company director since July 8, 2019. As a member of the Board, Defendant Wolf also serves as a member of the Audit, Compensation, and Compliance Committees. According to the 2023 Proxy Statement, as of April 25, 2023, Defendant Wolf beneficially owned 54,839 shares of Company common stock. Given that the price per share of the Company's common stock at the close of trading on April 25, 2023 was $11.49, Defendant Wolf owned approximately $630,100 worth of AdaptHealth stock as of that date.

61.     For the 2022 Fiscal Year, Defendant Wolf received $284,532 in total compensation from the Company. This included $117,500 in fees earned or paid in cash and $167,032 in stock awards. For the 2021 Fiscal Year, Defendant Wolf received $150,145 in total compensation from the Company. This included $50,000 in fees earned or paid in cash and $100,145 in stock awards. For the 2020 Fiscal Year, Defendant Wolf received $150,866 in total compensation from the Company. This included $50,000 in fees earned or paid in cash and $100,866 in stock awards.

62.     The 2023 Proxy Statement stated the following about Defendant Wolf:

**Dale Wolf** has served on our board of directors since the closing of the Business Combination. Mr. Wolf has served as a member of the board of directors of EHealth, Inc. since 2019 and as chairman of the board since 2021. He has also served as a member of the board of directors of Molina Healthcare, Inc. since 2013 and as chairman of the board since 2017. Mr. Wolf served as the President and Chief Executive Officer of Onecall Care Management Inc. from January 2016 to February 2019 and as executive chairman from September 2015 to January 2016. Mr. Wolf served as the President and Chief Executive Officer of DBW Healthcare, Inc. from January 2014 to June 2018. Mr. Wolf served as the executive chairman of Correctional Healthcare Companies, Inc., a national provider of correctional health care solutions, from December 2012 to July 2014. From 2005 to 2009, Mr. Wolf served as Chief Executive Officer of Coventry Health Care, Inc., a diversified national health care company, and served as the Executive Vice President, Chief Financial Officer and Treasurer of Coventry Health Care, Inc. from 1996 to 2005. Mr. Wolf was also a member of the boards of directors of Correctional Healthcare Companies, Inc. from 2012 to 2014, Coventry Healthcare, Inc. from 2005 to 2009 and Catalyst Health Solutions, Inc. from 2003 to 2012. Mr. Wolf graduated from Eastern Nazarene College with a Bachelor of Arts degree in Mathematics, with honors, and from the MIT Sloan School Senior Executive Program. He has also been a fellow in the Society of Actuaries since 1979.

**Defendant Quasha**

63.     Defendant Quasha served as a Company director from July 8, 2019 until he resigned effective September 1, 2021.

64.     For the 2021 Fiscal Year, Defendant Quasha received $25,000 in total compensation from the Company, which was made up entirely of fees earned or paid in cash. For the 2020 Fiscal Year, Defendant Quasha received $176,077 in total compensation from the Company. This included $50,000 in fees earned or paid in cash and $126,077 in stock awards.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

65.     By reason of their positions as officers, directors, and/or fiduciaries of AdaptHealth and because of their ability to control the business and corporate affairs of AdaptHealth, the Individual Defendants owed AdaptHealth and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage AdaptHealth in a fair, just, honest, and equitable manner. The Individual Defendants

were and are required to act in furtherance of the best interests of AdaptHealth and its shareholders so as to benefit all shareholders equally.

66.     Each director and officer of the Company owes to AdaptHealth and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

67.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of AdaptHealth, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

68.     To discharge their duties, the officers and directors of AdaptHealth were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

69.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of AdaptHealth, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised a majority of AdaptHealth's Board at all relevant times.

70.     As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

71.     To discharge their duties, the officers and directors of AdaptHealth were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of AdaptHealth were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Pennsylvania, and the United States, and pursuant to AdaptHealth's own Code of Ethics & Business Conduct (the "Code of Ethics");

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)      remain informed as to how AdaptHealth conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)      establish and maintain systematic and accurate records and reports of the business and internal affairs of AdaptHealth and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)      maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that AdaptHealth's operations would comply with all applicable laws and AdaptHealth's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)      exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)      refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)      examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

72.      Each of the Individual Defendants further owed to AdaptHealth and the shareholders the duty of loyalty requiring that each favor AdaptHealth's interest and that of its

shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

73.     At all times relevant hereto, the Individual Defendants were the agents of each other and of AdaptHealth and were at all times acting within the course and scope of such agency.

74.     Because of their advisory, executive, managerial, directorial, and controlling positions with AdaptHealth, each of the Individual Defendants had access to adverse, non-public information about the Company.

75.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by AdaptHealth.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

76.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

77.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (iii) artificially inflate the Company's stock price.

78.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of AdaptHealth was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

79.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

80.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of AdaptHealth and was at all times acting within the course and scope of such agency.

## ADAPTHEALTH'S CODE OF ETHICS

81.     According to the Code of Ethics, the Code of Ethics "provides each employee, officer, and director of the Company . . . with guidance and perspective in understanding business ethics as AdaptHealth."

82.     The Board represents that it adopted the Code of Ethics to "ensure that [Covered Persons'] conduct conforms to the highest ethical standards and is in accordance with all applicable laws, rules, and regulations."

83.     In a section titled "Compliance with All Laws & Regulations," the Code of Ethics states the following:

> All AdaptHealth Covered Persons are required to comply with all federal, state, and local laws and regulations. In addition, all Covered Persons are subject to the Company's Insider Trading Policy relating to transactions in the Company's securities and the securities of other companies. Covered Persons are obligated to report any actual or perceived violation of any applicable law or regulation, this Code, the Corporate Compliance Program, the Insider Trading Policy or any other AdaptHealth policy through the appropriate channels provided under the heading "How to File a Report" in this Code.

84.     In a section titled "Financial Integrity," the Code of Ethics states the following:

> **Business Financial Recording** – AdaptHealth requires honest and accurate recording and reporting of financial information in order to make responsible business decisions. All financial books, records and accounts must accurately reflect transactions and events and conform to generally accepted accounting principles and to AdaptHealth's system of internal controls. It is the policy of the Company to provide full, fair, accurate, timely and understandable disclosure in reports and documents filed with, or submitted to, the SEC and in other public communications.

85.     In a section titled "Avoiding Abuses of Trust," the Code of Ethics states the following, in relevant part:

> AdaptHealth expects its Covered Persons not to engage in any activity that might interfere, detract, or conflict, or appear to interfere, detract, or conflict, with AdaptHealth's best interest or the interests of AdaptHealth's customers or suppliers.

> **Conflicts of Interest** – All Covered Persons have a responsibility to avoid situations and relationships that involve actual or potential conflicts of interest. Generally, a conflict of interest arises whenever a Covered Person's personal interests diverge from his or her responsibilities to AdaptHealth or from AdaptHealth's best interests. Put another way, a conflict of interest is created whenever an activity, association, or relationship of a Covered Person might impair independent exercise of judgment in the Company's best interest.

> **Personal Conflicts of Interest** – Direct reporting or co-working relationships involving relatives or significant others in any capacity, whether by contract or through an outside service agency, may create conflicts of interest potentially harmful to both the Company and the Covered Persons involved and are generally discouraged. These situations, and others like them, where loyalties to AdaptHealth could be compromised, must be avoided. Covered Persons who believe they are

involved in a potential conflict of interest have a responsibility to discuss it with their supervisor or the Legal Department.

86. In a section titled "Insider Trading," the Code of Ethics states the following, in relevant part:

> "Insider trading" refers generally to buying or selling a security, in breach of a fiduciary duty or other relationship of trust and confidence, while in possession of material, nonpublic information about the security. Insider trading violations may also include "tipping" such information, securities trading by the person "tipped," and securities trading by those who misappropriate such information.
>
> The scope of insider trading violations can be wide- reaching. The Securities and Exchange Commission (the "SEC") has brought insider trading cases against corporate officers, directors, and employees who traded the corporation's securities after learning of significant, confidential corporate developments; friends, business associates, family members, and other "tippees" of such officers, directors, and employees who traded the securities after receiving such information; employees of law, banking, brokerage, and printing firms who were given such information in order to provide services to the corporation whose securities they traded; government employees who learned of such information because of their employment by the government; and other persons who misappropriated and took advantage of, confidential information from their employers.
>
> An "insider" can include officers, directors, major stockholders, and employees of an entity whose securities are publicly traded. In general, an insider must not engage in transactions in the securities of that entity for personal gain if that person possesses material, nonpublic information about the entity. In addition, an insider who is aware of material, nonpublic information must not disclose such information to family, friends, business or social acquaintances, employees, or independent contractors of the entity (unless such employees or independent contractors have a position within the entity giving them a clear right and need to know and a duty to keep such information strictly confidential), and other third parties.

87. In a section titled "Reporting Violations and Discipline," the Code of Ethics states the following:

> Your conduct can reinforce an ethical atmosphere and positively influence the conduct of fellow employees. You must proactively promote ethical behavior as a responsible employee or officer among those people in your work environment. If you are powerless to stop suspected misconduct or discover it after it has occurred, you must report it to the appropriate level of management at your location. Misconduct cannot be excused because it was directed or requested by another. In this regard, you are expected to alert management whenever an illegal, dishonest, or unethical act is discovered or suspected.

Strict adherence to this Code is vital. Supervisors are responsible for ensuring that Covered Persons are aware of and adhere to the provisions of this Code. For clarification or guidance on any point in this Code, please consult the Compliance Department. Covered Persons who are aware of or suspect a violation of this Code or other irregularities are expected to report these alleged violations as quickly as possible but in all events within five (5) working days.

Reports can be made through the appropriate channels provided under the heading "How to File a Report" listed below. Covered Persons will not be disciplined or otherwise retaliated against as a result of reporting such conduct.

Upon receipt of credible reports of suspected violations or irregularities, the Compliance Department shall immediately begin a detailed investigation and take corrective action where appropriate. Violations of this Code may result in discipline ranging from warnings and reprimand to discharge or, where appropriate, the filing of a civil or criminal complaint. Disciplinary decisions will be made by operational management in accordance with the AdaptHealth Corrective Action Plan and are subject to review by the Corporate Compliance Officer, General Counsel and V.P./Human Resources.

Covered Persons will be informed of the charges against them and will be given the opportunity to state their position before disciplinary actions are imposed. Consequences of noncompliance: Any person who ignores or violates this Code or any of the Company's ethical standards or other policies, including failures to report potential violations by others, will be subject to disciplinary action, up to and including termination of employment.

88.    In violation of the Code of Ethics, the Individual Defendants (as key officers and as members of the Company's Board) conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of the Exchange Act. Also, in violation of the Code of Ethics, the Individual Defendants failed to comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Ethics.

## AUDIT COMMITTEE CHARTER

89.    The Company also maintains an Audit Committee Charter. Under a section titled "Purpose," the Audit Committee Charter states the following about the Audit Committee's main objective:

- Performing the Board's oversight responsibilities as they relate to the Company's accounting policies and internal controls, financial reporting practices and legal and regulatory compliance, including, among other things:

- the quality and integrity of the Company's financial statements;

- the Company's compliance with legal and regulatory requirements;

- review of the independent registered public accounting firm's qualifications and independence;

- Provide to the Board such additional information and materials as it may deem necessary to make the Board aware of significant financial matters that require the attention of the Board.

- the performance of the Company's internal audit function and the Company's independent registered public accounting firm;

- maintaining, through regularly scheduled meetings, a line of communication between the Board and the Company's financial management, internal auditors and independent registered public accounting firm, including providing such parties with appropriate opportunities to meet separately and privately with the Committee on a periodic basis; and

- preparing the report to be included in the Company's annual proxy statement, as required by SEC rules.

90.    Under a section titled "Duties and Responsibilities," the Audit Committee Charter outlines the Audit Committee's responsibilities as follows:

**(a)**    Review and discuss the annual audited financial statements and the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations" with management and the independent registered public accounting firm. In connection with such review, the Committee will:

- Discuss with the independent registered public accounting firm the matters required to be discussed by all applicable auditing standards (as may be

modified or supplemented) and the matters in the written disclosures required by the applicable requirements of the Public Company Accounting Oversight Board regarding the independent accountant's communications with the Committee concerning independence;

- Review significant changes in accounting policies or auditing procedures;

- Review with the independent registered public accounting firm any problems or difficulties encountered in the course of their audit, including any change in the scope of the planned audit work and any restrictions placed on the scope of such work and management's response to such problems or difficulties;

- Review with the independent registered public accounting firm, management and the internal auditors the adequacy of the Company's internal control over financial reporting, and any significant findings and recommendations with respect to such controls; Review reports required to be submitted by the independent registered public accounting firm concerning: (a) all critical accounting policies and practices used; (b) all alternative treatments of financial information within generally accepted accounting principles ("GAAP") that have been discussed with management, the ramifications of such alternatives, and the accounting treatment preferred by the independent registered public accounting firm; (c) any other material written communications with management; and (d) any material financial arrangements of the Company which do not appear within the financial statements of the Company;

- Review (a) major issues regarding accounting principles and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles, and major issues as to the adequacy of the Company's internal control over financial reporting and any special audit steps adopted in light of any significant deficiencies or material weaknesses in such controls ; and (b) analyses prepared by management and/or the independent registered public accounting firm setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including analysis of the effects of alternative GAAP methods on the financial statements and the effects of regulatory and accounting initiatives, as well as offbalance sheet structures, on the financial statements of the Company; and

- Discuss policies and procedures concerning earnings press releases and review the type and presentation of information to be included in earnings press releases (paying particular attention to any use of "pro forma" or "adjusted" non-GAAP information), as well as financial information and earnings guidance provided to analysts and rating agencies.

**(b)**      Review and discuss the quarterly financial statements and the Company's disclosures provided in periodic quarterly reports including "Management's Discussion and Analysis of Financial Condition and Results of Operations" with management, the internal auditors and the independent registered public accounting firm.

**(c)**      The Company's independent registered public accounting firm is ultimately accountable to the Committee, which has the direct authority and responsibility to appoint, retain, compensate, terminate, select, evaluate and, where appropriate, replace the independent registered public accounting firm. In connection with its oversight of the external audit coverage, the Committee will have authority to:

- Appoint and replace (subject to stockholder approval, if deemed advisable by the Board) the independent registered public accounting firm;

- Approve the engagement letter and the fees to be paid to the independent registered public accounting firm;

- Pre-approve all audit and non-audit services to be performed by the independent registered public accounting firm and the related fees for such services other than prohibited nonauditing services as promulgated under rules and regulations of the SEC (subject to the inadvertent de-minimis exceptions set forth in the Act and the SEC rules) and establish pre-approval policies and procedures;

- Monitor and obtain confirmation and assurance as to the independent registered public accounting firm's independence, including ensuring that they submit on a periodic basis (not less than annually) to the Committee a formal written statement delineating all relationships between the independent registered public accounting firm and the Company consistent with the Public Company Accounting Oversight Board Rule 3526. The Committee is responsible for actively engaging in a dialogue with the independent registered public accounting firm with respect to any disclosed relationships or services that may impact the objectivity and independence of the independent registered public accounting firm and for taking appropriate action in response to the independent registered public accounting firm's report to satisfy itself of their independence;

- At least annually, obtain and review a report by the independent registered public accounting firm describing: the firm's internal quality-control procedures; any material issues raised by the most recent internal quality-control review, or peer review, of the firm, or by any inquiry or investigation by governmental or professional authorities, within the preceding five years, respecting one or more independent audits carried out by the firm, and any steps taken to deal with any such issues; and to assess the independent registered public accounting firm independence, all relationships between the independent registered public accounting firm

and the Company; • Meet with the independent registered public accounting firm prior to the annual audit to discuss planning and staffing of the audit;

- Review and evaluate the performance of the independent registered public accounting firm, as the basis for a decision to reappoint or replace the independent registered public accounting firm; • Set clear hiring policies for employees or former employees of the independent registered public accounting firm, including but not limited to, as required by all applicable laws and listing rules;

- Set clear policies for audit partner rotation in compliance with applicable laws and regulations; and

- Assure regular rotation of the lead (or coordinating) audit partner having primary responsibility for the audit and the audit partner responsible for reviewing the audit, as required by the Act, and consider whether rotation of the independent registered public accounting firm is required to ensure independence.

- Take, or recommend that the Board take, appropriate action to oversee the independence of the Company's independent registered public accounting firm; and

- Monitor compliance by the Company of the employee conflict of interest requirements contained in the Act and the rules and regulations promulgated by the SEC thereunder.

**(d)** Oversee internal audit activities. In connection with its oversight responsibilities, the Committee will:

- Review the appointment or replacement of the internal auditors;

- Review, in consultation with management, the independent auditors and the internal auditors, the plan and scope of internal audit activities, and, when deemed necessary or appropriate by the Committee, assign additional internal audit projects to appropriate personnel;

- Review the Committee's level of involvement and interaction with the Company's internal audit function, including the Committee's line of authority and role in appointing and compensating employees (or outsourced third parties) in the internal audit function;

- Review internal audit activities, budget, compensation and staffing; and

-  Review significant reports to management prepared by the internal auditing function and management's responses to such reports.

**(e)**     Receive periodic reports from the Company's independent registered public accounting firm, management and the Company's internal auditors to assess the impact on the Company of significant accounting or financial reporting developments that may have a bearing on the Company.

**(f)**     Review with the independent registered public accounting firm and the internal auditors the adequacy and effectiveness of the Company's accounting and internal control policies and procedures and any significant findings and recommendations with respect to such controls.

**(g)**     Review with the chief executive officer, chief financial officer and independent registered public accounting firm, periodically, the following:

- all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information; and

- any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting.

**(h)**     Resolve any differences in financial reporting between management and the independent registered public accounting firm.

**(i)**     Establish procedures for (i) the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters and (ii) the confidential, anonymous submission by employees of concerns regarding questionable accounting or auditing matters.

**(j)**     Establish procedures for the receipt, retention and treatment of reports of evidence of a material violation made by attorneys appearing and practicing before the SEC in the representation of the Company or any of its subsidiaries, or reports made by the Company's cochief executive officers in relation thereto.

**(k)**     Discuss policies and guidelines to govern the process by which risk assessment and risk management is undertaken.

**(l)**     Meet periodically with management to review and assess the Company's major financial risk exposures and the manner in which such risks are being monitored and controlled.

**(m)**     Consider and review, at least annually, with the Senior IT management person and the internal auditors the adequacy and effectiveness of the Company's monitoring of and system of internal controls over cybersecurity matters, including data and privacy protection policies and programs. Discuss with the Senior IT management person any significant cybersecurity incidents or matters that have come to management's attention during the conduct of their assessments.

**(n)**    Meet periodically (not less than annually) in separate executive session with each of the chief financial officer, the internal auditors, and the independent registered public accounting firm.

**(o)**    Review and approve all "related party transactions" requiring disclosure under SEC Regulation S-K, Item 404, in accordance with the policy set forth in Section 6 below.

**(p)**    Review the Company's policies relating to the ethical handling of conflicts of interest and review past or proposed transactions between the Company and members of management as well as policies and procedures with respect to officers' expense accounts and perquisites, including the use of corporate assets. The Committee shall consider the results of any review of these policies and procedures by the Company's internal auditors or independent registered public accounting firm.

**(q)**    Review and approve in advance any services provided by the Company's independent registered public accounting firm to the Company's executive officers or members of their immediate family.

**(r)**    Review the Company's program to monitor compliance with the Company's Code of Conduct and meet periodically with the Company's Compliance Committee to discuss compliance with the Code of Conduct.

**(s)**    As it determines necessary to carry out its duties, engage and obtain advice and assistance from outside legal, accounting or other advisers, the cost of such independent experts and/or advisors to be borne by the Company.

**(t)**    Report regularly to the Board with respect to Committee activities.

**(u)**    Prepare the report of the Committee required by the rules of the SEC to be included in the proxy statement for each annual meeting.

**(v)**    Review and reassess annually the adequacy of this Charter and recommend any proposed changes to the Board.

**(w)**    Review with management, the independent registered accounting firm, and the Company's legal advisors, as appropriate, any legal, regulatory or compliance matters, including any correspondence with regulators or government agencies and any employee complaints or published reports that raise material issues regarding our financial statements or accounting policies and any significant changes in accounting standards or rules promulgated by the Financial Accounting Standards Board, the SEC or other regulatory authorities.

**(x)**    Inquire and discuss with management the Company's compliance with applicable laws and regulations.

(y)     Determine the compensation and oversight of the work of the independent registered public accounting firm (including resolution of disagreements between management and the independent registered public accounting firm regarding financial reporting) for the purpose of preparing or issuing an audit report or related work.

91.     In violation of the Audit Committee Charter, Defendants Connors, Wolf, Lundberg, and Coppens failed to adequately review and discuss the Company's annual and quarterly earnings press releases; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and Code of Ethics.

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT

### *Relevant Background*

92.     AdaptHealth is a Delaware corporation that represents itself to be in the business of "healthcare-at-home solutions including home medical equipment ("HME"), medical supplies, and related services." The Company focuses on (i) sleep therapy equipment; (ii) medical devices and supplies for diabetes treatment; (iii) HME for patients discharged from acute care; (iv) oxygen home services; and (v) other HME devices and supplies for chronically ill patients.

93.     In 2020, AdaptHealth set its sights on acquiring diabetes companies, and on July 2, 2020, AdaptHealth finished its $487 million acquisition of Solara, which at the time was the largest independent distributor of CGMs. CGMs are devices used to automatically estimate an individual's blood glucose level, otherwise known as blood sugar.

94.     Through AdaptHealth's business model, the Company sells directly to patients and bills the patients' insurance providers to receive reimbursements. As such, the Company conducts its business with both private insurance providers and public insurance providers, such as CMS. Moreover, a substantial amount of AdaptHealth's revenues purportedly comes from CMS.

95.     Recently, technological advancements have been made pertaining to the production of CGMs. Indeed, while older versions of CGMs required patients to utilize a monthly supply of finger pricks with a stand-alone transmitter and monitor, newer versions of CGMs come in the form of a single small device, which bundles the transmitter, monitor, and sensor into the same device to be continuously worn by the patient, without the need for finger pricks.

96.     CMS, and many private insurance companies, calculate reimbursement rates based on the type of codes selling companies use when submitting their claims, with companies using either "A-codes" or "K-codes." The older diabetes technology involving traditional finger pricks is billed under A-codes and qualifies for monthly reimbursements of $400, in addition to a one-time sensor reimbursement ranging from $900 to $1,200. In contrast, the newer CGMs are billed under K-codes, and qualify for a much lower monthly reimbursements, ranging from just $250 to $270.

**<u>False and Misleading Statements</u>**

***August 4, 2020 Press Release and Conference Call***

97.     On August 4, 2020, the Company issued a press release, which it also filed with the SEC that same day via a Form 8-K, announcing its financial and operating results for the second quarter of 2020 ("2Q20 Press Release"). The 2Q20 Press Release discussed AdaptHealth's recently completed acquisition of Solara, representing that "[it] makes [the Company] a national leader in distribution of CGMs and other diabetes supplies[.]"

98.     In the 2Q20 Press Release, Defendants also reported a net revenue of $232.1 million, which Defendant McGee attributed to AdaptHealth's "scalable growth model focused on organic sales[.]"

99.     That same day, the Company hosted an earnings conference call with analysts and investors to discuss the Company's financial and operating results for the second quarter of 2020

("2Q20 Earnings Call"). During the 2Q20 Earnings Call, Defendant McGee characterized the Company's acquisition of Solara as a "transformative transaction that will establish AdaptHealth as a leader in the fast-growing diabetes management business."

100.     In addition, Defendant Parnes stated during the 2Q20 Earnings Call that CGM was "largely a resupply business that generates recurring revenue and is very well suited to our core competencies in resupply, billing and referral relationships" that would "drive down healthcare costs associated with diabetes."

101.     Also on the call, in response to an analyst's question about whether AdaptHealth was continuing to see strength in CGM resupply even while experiencing slowdown in the Company's other segments, Defendant McGee emphasized that the "CGM business also continues to have record-month-after-record-month" and attributed this growth to "a combination of us taking share, a combination of the Medicare relaxations opening up the number of eligible patients." Moreover, Defendant McGee stated that the recently acquired diabetes companies "combined with the existing CGM business . . . saw just an absolutely strong Q2."

### *August 7, 2020 Form 10-Q*

102.     On August 7, 2020, the Company filed with the SEC its Form 10-Q for the period ended June 30, 2020 (the "2Q 2020 10-Q"). The 2Q20 10-Q was signed by Defendants McGee and Clemens and attached certifications pursuant to Rules 13a-14(a) and 15(d)-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants McGee and Clemens attesting to the accuracy of the 2Q 2020 10-Q.

103.     The 2Q 2020 10-Q stated:

AdaptHealth could be adversely affected in some of the markets in which it operates if the auditing payor alleges substantial overpayments were made to AdaptHealth due to coding errors or lack of documentation to support medical necessity determinations. AdaptHealth cannot currently predict the adverse impact these

measures might have on its financial condition and results of operations, but such impact could be material.

***August 13, 2020 Canaccord Genuity Growth Conference***

104.     On August 13, 2020, Defendant McGee represented the Company at the Canaccord Genuity Growth Conference. During his presentation, Defendant McGee stated that the "next-gen[eration] diabetes technology" which included CGMs, were "in its infancy in terms of growth" meaning that "it's going to be a growth market for us." Additionally, Defendant McGee stated that the overall "CGM market is growing 20%-plus."

105.     During the conference, Defendant McGee also discussed the Solara acquisition, stating that "if you look at Solara, which was the diabetes business that we acquired in July, if you looked at that plus the business that we . . . have owned since the beginning here on CGM, we're seeing just spectacular growth" and that "the Solara acquisition it sort of opened up a new frontier for us on the CGM side."

***November 4, 2020 Press Release and Earnings Call***

106.     On November 4, 2020, the Company issued a press release announcing its financial and operating results for the third quarter of 2020, which it also filed with the SEC on a Form 8-K ("3Q 2020 Press Release"). The 3Q 2020 Press Release reported net revenue of $284.4 million, which AdaptHealth attributed to "the tremendous efforts of our employees and their dedication to patients and healthcare partners." Additionally, the 3Q 2020 Press Release emphasized that the Company "remained opportunistic throughout the quarter, acquiring several diabetes managements and [HME] businesses in high-growth areas."

107.     That same day, the Company hosted an earnings conference call with investors and analysts to discuss the Company's financial and operational results for the third quarter of 2020 (the "3Q 2020 Earnings Call"). During the call, Defendant McGee emphasized the "continued

market growth in continuous glucose monitors and insulin pumps and believe adoption rates will accelerate."

### *November 6, 2020 Form 10-Q*

108.    On November 6, 2020, the Company filed with the SEC its Form 10-Q for the period ended September 30, 2020 (the "3Q 2020 10-Q"). The 3Q 2020 10-Q was signed by Defendants McGee, Clemens, and Mullen and included SOX certifications signed by Defendants McGee and Clemens attesting to its accuracy.

109.    The 3Q 2020 10-Q stated the following, in relevant part:

> AdaptHealth could be adversely affected in some of the markets in which it operates if the auditing payor alleges substantial overpayments were made to AdaptHealth due to coding errors or lack of documentation to support medical necessity determinations. AdaptHealth cannot currently predict the adverse impact these measures might have on its financial condition and results of operations, but such impact could be material.

### *Secondary Public Offering*

110.    On January 5, 2021, the Company conducted its SPO. Through the SPO, and through the underwriters' decision to exercise their option to purchase additional shares, AdaptHealth sold 8,450,000 shares of its common stock, netting proceeds of approximately $264.4 million. Moreover, a selling stockholder sold an additional 750,000 shares of Company common stock to the public in the SPO.

111.    The SPO took place pursuant to the Form S-3 the Company filed with the SEC on December 18, 2020 (the "Registration Statement"), a Prospectus on Form 424B5 filed by AdaptHealth with the SEC on January 4, 2021, which incorporated and formed part of the Registration Statement, and a Prospectus on Form 424B5 filed by AdaptHealth with the SEC on January 7, 2021, which incorporated and formed part of the Registration Statement (the "Prospectus" and together with the Registration Statement, the "Offering Materials"). The

Registration Statement was signed by Defendants McGee, Clemens, Mullen, Barasch, Parnes, Quasha, Connors, Weaver, Wolf, Coppens, and Williams.

112.    Regarding the diabetes segment, the Offering Materials stated, "We believe that CGM and diabetes represent a $16 billion market segment. AdaptHealth believes that the CGM market could grow by 18% to $3.4 billion by 2022, and the insulin pump market could grow by 12% to $2.2 billion by 2022."

113.    Under a section titled "Business Strategy," the Offering Materials stated, "We aim to grow our revenue while expanding margins through targeted strategies for organic growth as well as opportunistic acquisitions that take advantage of our scalable, integrated technology platform." Additionally, it stated, "We believe that our strong referral relationships and broad product portfolio will help drive market share growth" and represented that its organic growth was driven by "maintaining and broadening" the Company's "strong network of highly diversified referral relationships."

***2021 Conferences***

114.    On January 14, 2021, Defendant McGee attended the JP Morgan Healthcare Conference on behalf of AdaptHealth. During his presentation, Defendant McGee stated that "CGM [] and diabetes management products" were "a very, very stable and attractive growth business."

115.    Then, on February 25, 2021, Defendants McGee and Griggs attended the SVB Leerink Global Healthcare Conference on behalf of AdaptHealth. During their presentation, Defendant McGee stated that the diabetes business "has been a huge growth engine" and that "to be honest the growth that we're seeing far transcends any headwinds."

116.    Then, on March 3, 2021, Defendants Parnes, Clemens, and Griggs attended the JP Morgan Global High Yield & Leveraged Finance Conference on behalf of AdaptHealth. During

the conference, Defendant Parnes stated, "CGM in diabetes . . . is really growing very, very rapidly" and that "diabetes is growing at 70%." Moreover, Defendant Parnes emphasized that "the diabetes markets . . . have much faster organic growth as a market."

### March 4, 2021 Press Release and Earnings Conference Call

117. On March 4, 2021, the Company issued a press release announcing its financial and operational results for the fourth quarter and full year 2020, which was also filed with the SEC via Form 8-K. The press release reported net revenue of $348.4 million, which the Company attributed to "diabetes business [driving] substantial growth."

118. The same day, the Company hosted an earnings conference call with investors and analysts to announce the financial and operating results for the fourth quarter and full year 2020 (the "FY2020 Earnings Call").

119. During the call, Defendant McGee had the following interaction regarding diabetes segment growth:

**Anton Hie**
And, Luke, earlier in a previous question, you talked about the dynamic between diabetes patient growth and unit growth versus a pricing. Can you give a little bit of color, what's going on there?

**Luke McGee**
Yeah. It's still so new in the grand scheme. Diabetes--advanced diabetes, primarily CGN, has really--was approved by Medicare, I believe in 2017, for reimbursement. And so, what you're seeing is there's been some shift to a pharmacy channel, which we acknowledge. And it hasn't at all slowed our top-line growth numbers. ***We've seen some payers switch to the Medicare payment methodology, not necessarily the rate but the K codes versus A codes.***

And so, we continue to see this as we've been underwriting these acquisitions. We're underwriting kind of gross margins, settling in the low 30s range, which is, we think, completely appropriate for the category, and so nothing that we're concerned about whatsoever. I think we're just--we're really excited because we're still early in the compounding of the census, which is because a lot of people who are coming on CGM are still new to the therapy.

We think that there's going to be a pretty long length of stay on this therapy, which means that not only are we seeing kind of growth in new starts, but we are seeing compounding in the census, which should persist for years. ***I mean, we're really excited about the diabetes (SP).***

(Emphasis added.)

### *2020 Form 10-K*

120.     On March 16, 2021, the Company filed with the SEC its Annual Report on Form 10-K for the fourth quarter and full year ended December 31, 2020 (the "2020 10-K"). The 2020 10-K was signed by Defendants McGee, Griggs, Clemens, Mullen, Barasch, Parnes, Quasha, Connors, Weaver, Wolf, Coppens, Williams, and Lundberg. Additionally, it contained certifications pursuant to SOX signed by Defendants McGee, Griggs, and Clemens attesting to its accuracy.

121.     The 2020 10-K represented, *inter alia*, that coding errors could be a potential risk factor for AdaptHealth, stating:

> AdaptHealth could be adversely affected in some of the markets in which it operates if the auditing payor alleges substantial overpayments were made to AdaptHealth due to coding errors or lack of documentation to support medical necessity determinations. AdaptHealth cannot currently predict the adverse impact these measures might have on its financial condition and results of operations, but such impact could be material.

### *May 6, 2021 Press Release and Earnings Call*

122.     On May 6, 2021, the Company issued a press release announcing its financial and operational results for the first quarter of 2021, which it also filed with the SEC via a Form 8-K (the "Q1 2021 Press Release"). The press release reported net revenue of $482.1 million which the Company attributed to its "growing diabetes product line" and its "strong organic growth for the quarter and the continued strength of [its] M&A pipeline."

123.     On that same day, the Company hosted an earnings conference call with investors and analysts to discuss its financial and operational results for the first quarter of 2021 ("Q1 2021

Earnings Call"). During the call, Defendant Clemens noted the Company's organic growth was up significantly, which he claimed was "led by new starts in our diabetes product lines."

124.   Likewise, Defendant Griggs stated on the call that with the "***current organic growth in diabetes and resupply***, we feel confident that the balances of 2021 will meet our organic growth expectations." (Emphasis added.)

### *1Q 2021 10-Q*

125.   On May 10, 2021, the Company filed with the SEC its Form 10-Q for the period ended March 31, 2021 (the "1Q 2021 10-Q"). The 1Q 2021 10-Q was signed by Defendants Griggs, Clemens, and Mullen. Additionally, attached to the 1Q 2021 10-Q were SOX certifications signed by Defendants Griggs and Clemens attesting to its accuracy.

126.   The 1Q 2021 10-Q stated:

> AdaptHealth could be adversely affected in some of the markets in which it operates if the auditing payor alleges substantial overpayments were made to AdaptHealth due to coding errors or lack of documentation to support medical necessity determinations. AdaptHealth cannot currently predict the adverse impact these measures might have on its financial condition and results of operations, but such impact could be material.

### *June 2, 2021 Jefferies Healthcare Conference*

127.   On June 2, 2021, Defendants Griggs, Parnes, and Clemens attended the Jefferies Healthcare Conference on behalf of AdaptHealth. During the conference, Defendant Clemens represented that diabetes was "beating our internal expectations for that business line." Moreover, Defendant Parnes represented that "our diabetes business today is growing extremely quickly."

### *2021 Proxy Statement*

128.   On July 6, 2021, the Company filed with the SEC its proxy statement on Schedule 14(a) (the "2021 Proxy Statement"). The 2021 Proxy Statement was solicited by Defendants Barasch, Connors, Coppens, Griggs, Lundberg, Parnes, Quasha, Weaver, Williams, and Wolf. The

2021 Proxy Statement solicited shareholders to, *inter alia*: (1) reelect Defendants Connors, Lundberg, Parnes, and Williams to the Board; (2) ratify KPMG LLP as the Company's independent registered public accounting firm for the fiscal year ending December 31, 2021; (3) approve the amendment and restatement of the Second Amended and Restated Certificate of Incorporation; (4) approve the amendment and restatement of the 2019 Stock Incentive Plan (the "2019 Plan"); and (5) transact such other business as may properly come before the meeting or any adjournment thereof.

129.    The amendment to the 2019 Plan sought to reserve an additional 2 million shares of Company common stock for issuance under the 2019 Plan, representing 1.3% of the Company's outstanding common stock. The 2021 Proxy Statement stated that the purpose of the amendment to the 2019 Plan was "to enhance our ability to attract and retain the types of directors, employees and consultants who will contribute to our long-range success[.]" The directors, employees and consultants of AdaptHealth are eligible for awards under the 2019 Plan. Accordingly, in soliciting shareholder approval of the amendment, each of the Defendants who solicited the 2021 Proxy Statement stood to benefit from the increased shares admissible under the 2019 Plan.

130.    Regarding "Board Leadership Structure and Role in Risk Oversight," the 2021 Proxy Statement states the following:

> Richard Barasch serves as the Chairman of our board of directors, Stephen Griggs serves as our Chief Executive Officer and Joshua Parnes serves as our President. We believe that the most effective leadership structure at the present time is to have separate Chairman, Chief Executive Officer and President positions because this allows the board of directors to benefit from having multiple strong voices bringing separate views and perspectives to meetings. Our board of directors has established an Executive Committee, consisting of Richard Barasch, Stephen Griggs, Ted Lundberg, Joshua Parnes, Bradley Coppens and Alan Quasha, to which the board has delegated certain decision-making power, including the ability to approve (i) any merger or acquisition transaction or capital expenditure transaction involving an aggregate cash investment or purchase price between $15 million and $40

million and (ii) any merger or acquisition transaction with an equity consideration component up to an aggregate purchase price of $40 million.

**Our board of directors is responsible for overseeing the overall risk management process at the Company**. Risk management is considered a strategic activity within the Company and, responsibility for managing risk currently rests with executive management while the board participates in the oversight of the process. The oversight responsibility of our board is enabled by management reporting processes designed to provide visibility to the board about the identification, assessment, and management of critical risks. Those areas of focus include strategic, operational, financial and reporting, compliance and other risks. **Our audit committee enhances the board's oversight of risk management and discusses with management, the independent auditor and the internal auditor policies with respect to risk assessment and risk management, including significant operating and financial risk exposures and the steps management has taken to monitor, control and report such exposures.** Further, our compensation committee enhances the board's oversight of risk management by considering the impact of the Company's compensation policies and plans, and the incentives created by the Company's compensation policies and plans, on the Company's risk profile.

(Emphasis added.)

131.    The 2021 Proxy Statement was false and misleading because it, *inter alia*, overstated the Board's exercise of its risk oversight role when, in reality, the Board was not adequately exercising its risk management and oversight functions. Moreover, the 2021 Proxy Statement failed to disclose that: (1) the Company had misstated the ability to generate and sustain organic growth in its diabetes segment; (2) the Company had engaged in improper and illicit billing practices in seeking reimbursements from insurance companies; (3) as a result of the foregoing, Defendants' statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis at all relevant times.

132.    As a result of the false and misleading elements of the 2021 Proxy Statement, shareholders voted to approve the amendment to the 2019 Plan and reelect Defendants Connors, Lundberg, Parnes, and Williams to the Board.

**August 5, 2021 Press Release and Earnings Call**

133.    On August 5, 2021, the Company issued a press release announcing its financial and operational results for the second quarter 2021, which it also filed with the SEC via a Form 8-K (the "Q2 2021 Press Release"). The Q2 2021 Press Release reported net revenue of $617 million, which Defendant Griggs was quoted as stating was "driven by the outstanding efforts of our combined team" and AdaptHealth's "strategy of organic growth, improving operations, and closing accretive acquisitions."

134.    That same day, the Company hosted an earnings conference call with investors and analysts to discuss its financial and operating results for the second quarter 2021 (the "Q2 2021 Earnings Call"). During the call, Defendant Panes emphasized that diabetes was the Company's fastest growing product category, stating "we are accelerating growth in all of our product categories, most dramatically in diabetes, our fastest growing product category."

### *Q2 2021 10-Q*

135.    On August 6, 2021, the Company filed with the SEC its financial results on Form 10-Q for the period ended June 30, 2021 (the "Q2 2021 10-Q"). The Q2 2021 10-Q was signed by Defendants Griggs, Clemens, and Mullen. Additionally, attached to it were certifications pursuant to SOX signed by Defendants Griggs and Clemens attesting to its accuracy.

136.    The Q2 2021 10-Q included the following risk factor regarding "coding errors":

> AdaptHealth could be adversely affected in some of the markets in which it operates if the auditing payor alleges substantial overpayments were made to AdaptHealth due to coding errors or lack of documentation to support medical necessity determinations. AdaptHealth cannot currently predict the adverse impact these measures might have on its financial condition and results of operations, but such impact could be material.

### *August 11, 2021 Canaccord Genuity Growth Conference*

137.    On August 11, 2021, Defendants Clemens, Griggs, and Parnes attended the Canaccord Genuity Growth Conference on behalf of the Company. At the conference, Defendant

Clemens emphasized "the terrific growth we're seeing in the diabetes product line, frankly, beating our own view of kind of end market growth. And we're just very, very pleased with the business. So, overall we did raise guidance."

### *November 4, 2021 Press Release and Earnings Conference Call*

138.    On November 4, 2021, the Company issued a press release announcing its financial and operational results for the third quarter of 2021, which it also filed with the SEC on Form 8-K (the "Q3 2021 Press Release"). The press release reported net revenue of $653.3 million, in addition to raising the Company's full-year 2021 guidance, which AdaptHealth attributed to the "outstanding efforts of our team members." The press release quoted Defendant Griggs as stating, "We continue to drive organic growth in the face of challenging external circumstances . . . as well as further expanding our presence through strategic acquisitions in key markets."

139.    On the same day, the Company hosted an earnings conference call with investors and analysts to discuss its financial results for the third quarter of 2021 (the "Q3 2021 Earnings Call"). During the call, Defendant Griggs stated: "More than a year ago, we entered the diabetes business with the acquisition of Solara, and we remain very pleased with its performance, which continues to exceed our expectations for 2021. We continue to grow this business with strategic acquisitions."

140.    During the same call, Defendant Clemens stated, in response to an analyst question asking for a comparison between the organic growth of diabetes pre and post pandemic,  "I think that over the last several years, you know, the end market just continues to grow, you know, very rapidly, you now, we think we're right in line with end market growth and diabetes and 2022, frankly, we think we're capturing a couple of points of shares as well."

### *Q3 2021 10-Q*

141.    On November 9, 2021, the Company filed with the SEC its financial results on Form 10-Q for the period ended September 30, 2021 (the "Q3 2021 10-Q"). The Q3 2021 10-Q was signed by Defendants Griggs, Clemens, and Mullens. Additionally, attached to the Q2 2021 10-Q were certifications pursuant to SOX signed by Defendants Griggs and Clemens attesting to its accuracy.

142.    The Q3 2021 10-Q provided the following risk factor regarding "coding errors":

> AdaptHealth could be adversely affected in some of the markets in which it operates if the auditing payor alleges substantial overpayments were made to AdaptHealth due to coding errors or lack of documentation to support medical necessity determinations. AdaptHealth cannot currently predict the adverse impact these measures might have on its financial condition and results of operations, but such impact could be material.

### SV Leerink Global Health Conference

143.    On February 18, 2022, Defendants Griggs, Clemens, and Parnes attended the SVB Leerink Global Healthcare Conference on behalf of AdaptHealth. During the conference, Defendant Parnes stated, "we're seeing steady growth that I was actually surprised that wasn't as impacted by COVID is the diabetes division, just really strong organic growth over the last year in general, and that market obviously is continuing to grow for us."

### 2021 10-K

144.    On March 1, 2022, the Company filed with the SEC its fourth quarter results and annual report for the period ended December 31, 2021 (the "2021 10-K"). The 2021 10-K was signed by Defendants Griggs, Clemens, Mullen, Barasch, Parnes, Connors, Weaver, Wolf, Coppens, Williams, Lundberg, and Belinfanti. Additionally, it contained certifications pursuant to SOX signed by Defendants Griggs and Clemens attesting to its accuracy.

145.    The 2021 10-K discussed the following risk factor regarding "coding errors":

> AdaptHealth could be adversely affected in some of the markets in which it operates if the auditing payor alleges substantial overpayments were made to AdaptHealth

due to coding errors or lack of documentation to support medical necessity determinations. AdaptHealth cannot currently predict the adverse impact these measures might have on its financial condition and results of operations, but such impact could be material.

### 2022 Proxy Statement

146.    On May 2, 2022, the Company filed with the SEC its proxy statement on Schedule 14A (the "2022 Proxy Statement"). The 2022 Proxy Statement solicited shareholders to, *inter alia*: (1) reelect Defendants Coppens, Weaver, and Wolf to the Board; (2) ratify the selection of KPMG as the Company's independent registered accounting firm; (3) approve via a non-binding advisory vote executive compensation; and (4) determine the frequency at which the Company should hold "say-on-pay" votes. The 2022 Proxy Statement was solicited by Defendants Barasch, Belinfanti, Connors, Coppens, Griggs, Lundberg, Parnes, Weaver, Williams, and Wolf.

147.    Regarding the Board's "Role in Risk Oversight," the 2022 Proxy Statement stated:

Richard Barasch serves as the Chairman of our board of directors, Stephen Griggs serves as our Chief Executive Officer and Joshua Parnes serves as our President. We believe that the most effective leadership structure at the present time is to have separate Chairman, Chief Executive Officer and President positions because this allows the board of directors to benefit from having multiple strong voices bringing separate views and perspectives to meetings. Our board of directors has established an Executive Committee, consisting of Richard Barasch, Stephen Griggs, Ted Lundberg, Joshua Parnes and Gregory Belinfanti, to which the board has delegated certain decision-making power, including the ability to approve (i) any merger or acquisition transaction or capital expenditure transaction involving an aggregate cash investment or purchase price between $15 million and $40 million and (ii) any merger or acquisition transaction with an equity consideration component up to an aggregate purchase price of $40 million.

Our board of directors is responsible for overseeing the overall risk management process at the Company. Risk management is considered a strategic activity within the Company and, responsibility for managing risk currently rests with executive management while the board participates in the oversight of the process. The oversight responsibility of our board is enabled by management reporting processes designed to provide visibility to the board about the identification, assessment, and management of critical risks. Those areas of focus include strategic, operational, financial and reporting, compliance and other risks. Our audit committee enhances the board's oversight of risk management and discusses with management, the independent auditor and the internal auditor policies with respect to risk assessment

and risk management, including significant operating and financial risk exposures and the steps management has taken to monitor, control and report such exposures. Further, our compensation committee enhances the board's oversight of risk management by considering the impact of the Company's compensation policies and plans, and the incentives created by the Company's compensation policies and plans, on the Company's risk profile.

148.    The 2022 Proxy Statement was false and misleading because it failed to disclose that, despite assertions to the contrary, the Board was not adequately exercising its risk management and oversight functions. Moreover, the 2022 Proxy Statement failed to disclose that: (1) the Company had misstated the ability to generate and sustain organic growth in its diabetes segment; (2) the Company had engaged in improper and illicit billing practices in seeking reimbursements from insurance companies; (3) as a result of the foregoing, Defendants' statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis at all relevant times.

149.    As a result of the false and misleading elements of the 2022 Proxy Statement, company shareholders voted to, *inter alia*, reelect Defendants Coppens, Weaver, and Wolf to the Board, allowing them to further breach their fiduciary duties and engage in the scheme to cause the Company to make false and misleading statements.

### *May 10, 2022 Press Release and Earnings Call*

150.    On May 10, 2022, the Company issued a press release announcing its financial and operating results for the first quarter of 2022, which it also filed with the SEC on a Form 8-K (the "Q1 2022 Press Release"). The press release reported net revenue of $706.2 million, which Defendant Griggs attributed to "continued strength in our diabetes product line."

151.    That same day, the Company hosted an earnings conference call with investors and analysts to discuss the Company's financial results for the first quarter of 2022 (the "Q1 2022 Earnings Call"). During the call, Defendant Parnes emphasized the Company was seeking

additional acquisitions, stating that AdaptHealth was "constantly assessing strategic opportunities to . . . increase our revenue" and further claimed that AdaptHealth's "expansion into CGM supply and diabetes services in 2020 is a good example of a strategic expansion into a new market. Additionally, Defendant Parnes stated that AdaptHealth had "integrated Solara and our other diabetes supply acquisitions."

### *Bank of America Healthcare Conference*

152.     On May 11, 2022, Defendants Griggs and Clemens attended the Bank of America Healthcare Conference on behalf of AdaptHealth. In response to a question regarding what was driving the Company's growth, Defendant Griggs stated, "growth rates are going to be pretty strong for certainly the foreseeable future," and "we're very, very comfortable with that high teens growth rate right now."

### *Jeffries Healthcare Conference*

153.     On June 8, 2022, Defendant Parnes attended the Jeffries Healthcare Conference on behalf of AdaptHealth. At the conference, Defendant Parnes stated, "we feel very comfortable with that as we stand here today . . . when we think about the product lines, first is diabetes. I mean, very high growth." Additionally, Defendant Parnes stated, in response to an analyst's question about the sustainability of AdaptHealth's growth, that "one of the interesting things we thought about strategically that would be a good fit for us was the resupply component of a CGM . . . that played itself out where we've done a very, very nice job . . . where we've been able to grow their resupply footprint consistently, steadily."

### *August 9, 2022 Press Release*

154.     On August 9, 2022, the Company issued a press release announcing its financial and operational results for the second quarter of 2022, which it also filed with the SEC via Form

8-K (the "Q2 2022 Press Release"). The press release reported net revenue of $727.6 million and "double-digit growth" in the Company's diabetes product line. The Company attributed the double-digit growth to "important investments in technology."

### November 8, 2022 Press Release and Earnings Call

155.    On November 8, 2022, the Company issued a press release announcing its financial and operational results for the third quarter 2022, which it also filed with the SEC via Form 8-K (the "Q3 2022 Press Release"). The press release reported a "record" net revenue of $756.5 million with the Company's "diabetes product line once again posting double-digit growth." The Company attributed its growth to "operational excellence initiatives" and the "resilience of [its] business."

156.    That same day, the Company hosted an earnings conference call with analysts and investors to discuss the Company's financial results for the third quarter of 2022 (the "Q3 2022 Earnings Call"). During the call, Defendant Griggs stated, "We continue to be confident in the sustained growth potential in diabetes, given the expanding acceptance of CGM as a critical component in managing diabetes and related comorbidities."

157.    Later on the call, Defendant Griggs stated, "everybody believes that the growth rates that we've seen in the past two or three years on the CGMs will, maybe not quite as high, but they'll still continue throughout the next two or three years."

158.    Thus, the statements identified in ¶¶ 97-109, 112-127, 133-145, and 150-157 were materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants failed to disclose, *inter alia*, that: (1) the Company had misstated the ability to generate and sustain organic growth in its diabetes segment; (2) the Company had engaged in improper and illicit billing practices in seeking reimbursements from insurance companies; (3) the Company's purported warnings that it "could be adversely

affected" if it was found to engage in overbilling as a result of "coding errors" omitted that the risk presented by overbilling had already materialized due to the Defendants' misconduct as alleged herein; and (4) as a result of the foregoing, Defendants' statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis at all relevant times.

<h3 align="center">**The Truth Emerges**</h3>

159.     The truth emerged on February 27, 2023 when the Company announced a surprise loss of $0.02 per share for the quarter of 2022. This was significantly short of the expected gain of $0.27 per share that analysts were expecting based on the Individual Defendants' representations throughout the Relevant Period. As a result, the Company reduced its guidance for 2023, lowering revenue expectations by over 1.5%. The Company attributed the poor financial performance and lowered guidance to "tempered expectations on diabetes."

160.     On this news, the Company's stock price declined by $5.99 per share, or 27%, from a closing price of $21.98 per share on February 27, 2023 to close at $15.99 per share on February 28, 2023.

<h3 align="center">**Repurchases During the Relevant Period**</h3>

161.     During the Relevant Period, the Individual Defendants caused the Company to initiate repurchases of its common stock that substantially damaged the Company. In total, the Company spent an aggregate amount of over $14.1 million to repurchase 750,835 shares of its own common stock at artificially inflated prices between June 1, 2022 and September 30, 2022.

162.     According to the Q2 2022 10-Q, between the period June 1, 2022 to June 30, 2022, the Company purchased 199,418 shares of its common stock for approximately $3,380,135.10 at an average price per share of approximately $16.95.

163.    As the Company's stock was actually worth only $15.99 per share, the price at closing on February 28, 2023, the Company overpaid by approximately $191,441.28 for repurchases of its own stock between June 1, 2022 and June 30, 2022.

164.    According to the Q3 2022 10-Q, between August 1, 2022 to August 31, 2022, the Company repurchased 436,914 shares of its common stock for approximately $8,576,621.82 at an average price per share of approximately $19.63.

165.    As the Company's stock was actually worth only $15.99 per share, the price at closing on February 28, 2023, the Company overpaid by approximately $1,590,366.96 for repurchases of its own stock between August 1, 2022 and August 31, 2022.

166.    According to the Q3 2022 10-Q, between September 1, 2022 to September 30, 2022, the Company purchased 114,503 shares of its common stock for approximately $2,164,106.70 at an average price per share of approximately $18.90.

167.    As the Company's stock was actually worth only $15.99 per share, the price at closing on February 28, 2023, the Company overpaid by approximately $333,203,73 for repurchases of its own stock between September 1, 2022 and September 30, 2022.

168.    Due to the artificial inflation of the Company's stock price caused by misrepresentations made by and/or caused to be made by the Individual Defendants, the Company paid on average $2.50 more than the actual worth of each share during the Relevant Period. Thus, the total payment by the Company for its repurchases during the Relevant Period was approximately $14.1 million as the Company repurchased 750,835 shares of its own stock at artificially inflated prices, representing a total overpayment of over $2.1 million.

## DAMAGES TO ADAPTHEALTH

169.    As a direct and proximate result of the Individual Defendants' conduct, AdaptHealth will lose and expend many millions of dollars.

170.    Such losses include the over $2.1 million the Company overpaid for repurchases of its own stock during the period when the Company's stock price was artificially inflated due to the false and misleading statements discussed above.

171.    Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

172.    Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on any misconduct alleged herein and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

173.    Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

174.    Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

175.    As a direct and proximate result of the Individual Defendants' conduct, AdaptHealth has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations.

## DERIVATIVE ALLEGATIONS

176.    Plaintiff brings this action derivatively and for the benefit of AdaptHealth to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of AdaptHealth, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of Sections 10(b) and 20(a) of the Exchange Act.

177.    AdaptHealth is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

178.    Plaintiff is, and has been at all relevant times, a shareholder of AdaptHealth. Plaintiff will adequately and fairly represent the interests of AdaptHealth in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

179.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

180.    A pre-suit demand on the Board is futile and, therefore, excused. At the time of filing of this complaint, the Board consists of the following nine individuals: Defendants Barasch, Belinfanti, Connors, Coppens, Lundberg, Parnes, Weaver, Williams, and Wolf (the "Director Defendants"). Plaintiff needs only to allege demand futility as to five of the nine Director Defendants that were on the Board at the time of the filing of this complaint.

181.    Demand is excused as to all of the Director Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and

misleading statements and omissions of material fact, and, at the same time, to cause AdaptHealth to overpay by almost $1.6 billion for repurchases of its own stock at artificially inflated prices, all of which renders the Director Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

182.     In complete abdication of their fiduciary duties, the Director Defendants either knowingly or recklessly caused or permitted the Company to issue materially false and misleading statements. Specifically, the Director Defendants caused AdaptHealth to issue false and misleading statements which were intended to make AdaptHealth appear more profitable and attractive to investors. Moreover, the Director Defendants caused the Company to fail to maintain adequate internal controls. As a result of the foregoing, the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not independent or disinterested, and demand upon them is futile, and thus, excused.

183.     Additional reasons that demand on Defendant Barasch is futile follow. Defendant Barasch has served as the Chairman of the Board since 2019 and as interim CEO of AdaptHealth since July 1, 2023. As such, the Company provides Defendant Barasch with his principal occupation for which he receives lucrative compensation. Thus, as the Company admits, he is a non-independent director. As interim-CEO and a director throughout the Relevant Period, Defendant Barasch was ultimately responsible for all of the false and misleading statements and omissions that were made by or on behalf of the Company during the Relevant Period, including those which he signed in the 2020 and 2021 10-Ks and in the 2021 and 2022 Proxy Statements. As the Company's highest officer and trusted Chairman of the Board, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor internal controls over reporting and engagement in

the scheme, and consciously disregarded his duty to protect corporate assets. Further, Defendant Barasch is a defendant in the Securities Class Action. For these reasons, Defendant Barasch breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

184.    Additional reasons that demand on Defendant Belinfanti is futile follow. Defendant Belinfanti has served as a Company director since September 2021. As a member of the Board, Defendant Belinfanti also serves as a member of the Compensation Committee and the Nominating & Governance Committee. Defendant Belinfanti has received and continues to receive lucrative compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duty to protect corporate assets. Furthermore, Defendant Belinfanti signed, and thus personally made, the false and misleading statements and omissions in the 2021 10-K. Additionally, Defendant Belinfanti solicited the 2022 Proxy Statement, which contained materially false and misleading elements and resulted in the reelections of Defendants Coppens, Weaver, and Wolf to the Board. For these reasons, Defendant Belinfanti breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

185.    Additional reasons that demand on Defendant Connors is futile follow. Defendant Connors has served as a Company director since July 8, 2019. As a member of the Board, Defendant Connors serves as the Chairperson of the Audit Committee and as a member of the Nominating & Governance Committee. Defendant Connors has received and continues to receive lucrative compensation for his role as a director as described above. As a trusted Company director,

he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duty to protect corporate assets. Furthermore, Defendant Connors signed, and thus personally made, the false and misleading statements and omissions in the 2020 and 2021 10-Ks. Additionally, Defendant Connors solicited the 2021 and 2022 Proxy Statements, which contained false and misleading elements and resulted in, *inter alia*, material benefits from the amendments in the 2019 Plan and his reelection to the Board. Moreover, Defendant Connors is a defendant in the Securities Class Action. For these reasons, Defendant Connors breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

186.    Additional reasons that demand on Defendant Coppens is futile follow. Defendant Coppens has served as a Company director since July 2020. As a member of the Board, Defendant Coppens serves as the Chairperson of the Compensation Committee and as a member of the Audit Committee. Defendant Coppens has received and continues to receive lucrative compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duty to protect corporate assets. Furthermore, Defendant Coppens signed, and thus personally made, the false and misleading statements and omissions in the 2020 and 2021 10-Ks. Additionally, Defendant Coppens solicited the 2021 and 2022 Proxy Statements, which contained false and misleading elements and resulted in, *inter alia*, material benefits from the amendments in the 2019 Plan and his reelection to the Board. Moreover,

Defendant Coppens is a defendant in the Securities Class Action. For these reasons, Defendant Coppens breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

187. Additional reasons that demand on Defendant Lundberg is futile follow. Defendant Lundberg has served as a Company director since February 2021. As a member of the Board, Defendant Lundberg serves as a member of the Audit and Nominating & Governance Committees. Defendant Lundberg has received and continues to receive lucrative compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duty to protect corporate assets. Furthermore, Defendant Lundberg signed, and thus personally made, the false and misleading statements and omissions in the 2020 and 2021 10-Ks. Additionally, Defendant Lundberg solicited the 2021 and 2022 Proxy Statements, which contained false and misleading elements and resulted in, *inter alia*, material benefits from the amendments in the 2019 Plan and his reelection to the Board. For these reasons, Defendant Lundberg breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

188. Additional reasons that demand on Defendant Parnes is futile follow. Defendant Parnes has served as President of the Company and as a member of the Board since July 8, 2019. Defendant Parnes has received and continues to receive lucrative compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor such controls over reporting and engagement in the scheme, and

consciously disregarded his duty to protect corporate assets. Defendant Parnes is personally responsible for the numerous false and misleading statements he made on behalf of the company during earnings conference calls and at conferences. Furthermore, Defendant Parnes signed, and thus personally made, the false and misleading statements and omissions in the 2020 and 2021 10-Ks. Additionally, Defendant Parnes solicited the 2021 and 2022 Proxy Statements, which contained false and misleading elements and resulted in, *inter alia*, material benefits from the amendments in the 2019 Plan and his reelection to the Board. Moreover, Defendant Parnes is a defendant in the Securities Class Action. For these reasons, Defendant Parnes breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

189.    Additional reasons that demand on Defendant Weaver is futile follow. Defendant Weaver has served as a Company director since February 2018. As a member of the Board, Defendant Weaver serves as Chairperson of the Compliance Committee and as a member of the Nominating & Governance Committee. Defendant Weaver has received and continues to receive lucrative compensation for her role as a director as described above. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duty to protect corporate assets. Additionally, during the Relevant Period, before the truth had been revealed and while the stock prices were still artificially inflated as a result of the Individual Defendant's scheme, Defendant Weaver sold 1,050 shares of Company common stock on inside information at a price of $38.04 per share for total proceeds of approximately $39,943. Furthermore, Defendant Weaver signed, and thus personally made, the false and misleading statements and omissions in the 2020

and 2021 10-Ks. Additionally, Defendant Weaver solicited the 2021 and 2022 Proxy Statements, which contained false and misleading elements and resulted in, *inter alia*, material benefits from the amendments in the 2019 Plan and his reelection to the Board. Moreover, Defendant Weaver is a defendant in the Securities Class Action. For these reasons, Defendant Weaver breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

190.    Additional reasons that demand on Defendant Williams is futile follow. Defendant Williams has served as a Company director since July 2020. As a member of the Board, Defendant Williams also serves as a member of the Compensation and Compliance Committees. Defendant Williams has received and continues to receive lucrative compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duty to protect corporate assets. Furthermore, Defendant Williams signed, and thus personally made, the false and misleading statements and omissions in the 2020 and 2021 10-Ks. Additionally, Defendant Williams solicited the 2021 and 2022 Proxy Statements, which contained false and misleading elements and resulted in, *inter alia*, material benefits from the amendments in the 2019 Plan and his reelection to the Board. Moreover, Defendant Williams is a defendant in the Securities Class Action. For these reasons, Defendant Williams breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and therefore excused.

191.    Additional reasons that demand on Defendant Wolf is futile follow. Defendant Wolf has served as a Company director since July 8, 2019. As a member of the Board, Defendant

Wolf also serves as a member of the Audit, Compensation, and Compliance Committees. Defendant Wolf has received and continues to receive lucrative compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duty to protect corporate assets. Furthermore, Defendant Wolf signed, and thus personally made, the false and misleading statements and omissions in the 2020 and 2021 10-Ks. Additionally, Defendant Wolf solicited the 2021 and 2022 Proxy Statements, which contained false and misleading elements and resulted in, *inter alia*, material benefits from the amendments in the 2019 Plan and his reelection to the Board.  Moreover, Defendant Wolf is a defendant in the Securities Class Action. For these reasons, Defendant Wolf breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

192.    Additional reasons that demand on the Board is futile follow.

193.    Defendants Connors, Lundberg, Coppens, and Wolf served as members of the Audit Committee for parts of or the entirety of the Relevant Period. In violation of the Audit Committee Charter, Defendants Connors, Lundberg, Coppens, and Wolf failed to adequately review and discuss the Company's Forms 10-K and Forms 10-Q; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and Code of Ethics. Thus, Defendants Connors, Lundberg, Coppens, and Wolf further breached their fiduciary duties, are not disinterested, and demand is excused as to them.

194.    In violation of the Code of Ethics, the Director Defendants engaged in or permitted the scheme to cause the Company to issue materially false and misleading statements to the public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In violation of the Code of Ethics, the Director Defendants failed to maintain the accuracy of Company records; protect and ensure the efficient use of Company assets; comply with all applicable laws, rules, and regulations; and properly report violations of the Code of Ethics and applicable laws, rules, and regulations. Thus, the Director-Defendants breached the Company's own Code of Ethics, are not disinterested, and demand is excused as to them.

195.    AdaptHealth has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director Defendants have not filed any lawsuits against the Individual Defendants or others who were responsible for that wrongful conduct to attempt to recover for AdaptHealth any part of the damages AdaptHealth suffered and will continue to suffer thereby. Thus, any demand upon the Director Defendants would be futile.

196.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and are not capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

197.    The acts complained of herein constitute violations of fiduciary duties owed by AdaptHealth's officers and directors, and these acts are incapable of ratification.

198.    The Director Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of AdaptHealth. If there is a directors' and officers' liability insurance policy covering the Director Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director Defendants were to sue themselves or certain of the officers of AdaptHealth, there would be no directors' and officers' insurance protection. Accordingly, the Director Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director Defendants is futile and, therefore, excused.

199.    If there is no directors' and officers' liability insurance, then the Director Defendants will not cause AdaptHealth to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability.  Accordingly, demand is futile in that event, as well.

200.    Thus, for all of the reasons set forth above, all of the Director Defendants, and, if not all of them, at least five of the Director Defendants, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

**FIRST CLAIM**

**Against Individual Defendants for Violations of Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934**

201.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

202.    The Individual Defendants participated in schemes to defraud with the purpose and effect of defrauding AdaptHealth. Not only is AdaptHealth now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also one of the largest victims of the unlawful schemes perpetrated upon AdaptHealth by the Individual Defendants. With the price of its common stock trading at artificially inflated prices due to the Individual Defendants' misconduct, the Individual Defendants caused the Company to repurchase 750,000 of its own shares at artificially inflated prices, damaging AdaptHealth.

203.    During the Relevant Period, the Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements made in conference calls, and periodic and current reports filed with the SEC.

204.    The Individual Defendants employed devices, schemes and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about AdaptHealth not misleading.

205.    The Individual Defendants, as top executives and directors of the Company are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as directors and officers of the Company, the Individual Defendants were able to and

did control the conduct complained of herein and the content of the public statements disseminated by AdaptHealth.

206.    The Individual Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the schemes and the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the schemes set forth herein and for the false and misleading statements and/or omissions disseminated to the public through filings with the SEC.

207.    By virtue of the foregoing, the Individual Defendants have violated § 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

208.    Plaintiff, on behalf of AdaptHealth, has no adequate remedy at law.

## SECOND CLAIM

### Against the Individual Defendants for Violations of Section 20(a)
### of the Securities Exchange Act of 1934

209.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

210.    The Individual Defendants, by virtue of their positions with AdaptHealth and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of AdaptHealth and each of its officers and directors who made the false and misleading statements alleged herein within the meaning of § 20(a) of the Exchange Act. The Individual Defendants had the power and influence and exercised the same to cause AdaptHealth to engage in the illegal conduct and practices complained of herein.

211.    Plaintiff, on behalf of AdaptHealth, has no adequate remedy at law.

## THIRD CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

212.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

213.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of AdaptHealth's business and affairs.

214.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

215.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of AdaptHealth.

216.    In breach of their fiduciary duties owed to AdaptHealth, the Individual Defendants willfully or recklessly caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (1) the Company had misstated the ability to generate and sustain organic growth in its diabetes segment; (2) the Company had engaged in improper and illicit billing practices in seeking reimbursements from insurance companies; (3) the Company's purported warnings that it "could be adversely affected" if it was found to engage in overbilling as a result of "coding errors" omitted that the risk presented by overbilling had already materialized due to the Defendants' misconduct as alleged herein; and (4) as a result of the foregoing, Defendants' statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis at all relevant times.

217. In further breach of their fiduciary duties, the Individual Defendants solicited shareholders to approve amendments to the 2019 Plan, entitling them to increased compensation and benefits at the expense of the Company and while they were in breach of their fiduciary duties.

218. In further breach of their fiduciary duties, the Individual Defendants caused the Company to repurchase 750,835 shares of Company common stock for approximately $14.1 million total, resulting in the Company overpaying by approximately $2.1 million.

219. Also in breach of their fiduciary duties, the Individual Defendants failed to maintain adequate internal controls.

220. The Individual Defendants had actual or constructive knowledge that they had caused the Company to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of AdaptHealth's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

221. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

222. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, AdaptHealth has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

223. Plaintiff, on behalf of AdaptHealth, has no adequate remedy at law.

## FOURTH CLAIM

### Against Individual Defendants for Unjust Enrichment

224.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

225.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, AdaptHealth.

226.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from AdaptHealth that was tied to the performance or artificially inflated valuation of AdaptHealth or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct. This includes lavish compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company. This also includes compensation received under the 2019 Plan and its amendments, which certain Individual Defendants inducted the Company's shareholders to approve through false and misleading representations.

227.    Plaintiff, as a shareholder and a representative of AdaptHealth, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

228.    Plaintiff, on behalf of AdaptHealth, has no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants for Abuse of Control

229.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

230.     The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence AdaptHealth, for which they are legally responsible.

231.     As a direct and proximate result of the Individual Defendants' abuse of control, AdaptHealth has sustained significant damages. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, AdaptHealth has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

232.     Plaintiff, on behalf of AdaptHealth, has no adequate remedy at law.

## SIXTH CLAIM

### Against Individual Defendants for Gross Mismanagement

233.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

234.     By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of AdaptHealth in a manner consistent with the operations of a publicly held corporation.

235.     As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, AdaptHealth has sustained and will continue to sustain significant damages.

236.     As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

237.     Plaintiff, on behalf of AdaptHealth, has no adequate remedy at law.

## SEVENTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

238.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

239.    The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the shareholders and the Company.

240.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused AdaptHealth to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, to be subject to investigations and civil inquiries, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

241.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

242.    Plaintiff, on behalf of AdaptHealth, has no adequate remedy at law.

## EIGHTH CLAIM

**Against Defendants Barasch, Clemens, Griggs, McGee, Parnes, Connors, Coppens, Mullen, Quasha, Weaver, Williams, and Wolf for Contribution Under Section 11(f) of the Securities Act and 21D of the Exchange Act**

243.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

244.    As a result of the conduct and events alleged above, the Company is a defendant in the Securities Class Action brought on behalf of AdaptHealth shareholders, in which it is a joint tortfeasor in claims brought under Sections 11 and 15 of the Securities Act.

245.    Federal law provides AdaptHealth with a cause of action against other alleged joint tortfeasors under Section 11(f) of the Securities Act.

246.     The plaintiffs in the Securities Class Action allege that the Registration Statement issued in connection with the Company's SPO contained untrue statements of material facts or omitted to state other facts necessary to make the statements made not misleading and omitted to state material facts required to be stated therein.

247.     AdaptHealth is the registrant for the Secondary Public Offering. Defendants Barasch, Clemens, Griggs, McGee, Parnes, Connors, Coppens, Mullen, Quasha, Weaver, Williams, and Wolf were responsible for the contents and dissemination of the Registration Statement.

248.     As issuer of the shares, AdaptHealth is strictly liable to the class action plaintiffs and the class for the misstatements and omissions.

249.     The plaintiffs in the Securities Class Action allege that none of the defendants named therein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement and other subsequent public filings were true and without omissions of any material facts and were not misleading.

250.     Defendants Barasch, Clemens, Griggs, McGee, Parnes, Connors, Coppens, Mullen, Quasha, Weaver, Williams, and Wolf because of their positions of control and authority as controlling shareholders, officers and/or directors of AdaptHealth, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of AdaptHealth, including the wrongful acts complained of herein and in the Securities Class Action.

251.     Accordingly, Defendants Barasch, Clemens, Griggs, McGee, Parnes, Connors, Coppens, Mullen, Quasha, Weaver, Williams, and Wolf are liable under Section 11(f) of the Securities Act, 15 U.S.C. § 77k(f)(1), which creates a private right of action for contribution, and

Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

252.    As such, AdaptHealth is entitled to receive all appropriate contribution or indemnification from Defendants Barasch, Clemens, Griggs, McGee, Parnes, Connors, Coppens, Mullen, Quasha, Weaver, Williams, and Wolf.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of AdaptHealth, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to AdaptHealth;

(c)    Determining and awarding to AdaptHealth the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing AdaptHealth and the Individual Defendants to take all necessary actions to reform and improve AdaptHealth's corporate governance and internal procedures to comply with applicable laws and to protect AdaptHealth and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and

guidelines of the Board;

     2. a provision to permit the shareholders of AdaptHealth to nominate at least five candidates for election to the board; and

     3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

     (e)    Awarding AdaptHealth restitution from the Individual Defendants, and each of them;

     (f)    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

     (g)    Granting such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: March 20, 2024

              **THE BROWN LAW FIRM, P.C.**

              */s/ John Coyle IV*
              John Coyle IV
              Timothy Brown
              767 Third Avenue, Suite 2501
              New York, NY 10017
              Telephone: (516) 922-5427
              Facsimile: (516) 344-6204
              Email: tbrown@thebrownlawfirm.net

              *Counsel for Plaintiff*

## **VERIFICATION**

I, Weiding Wu, am a plaintiff in the within action.  I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 19 day of March, 2024.

Weiding Wu